WOODRUFF *v.* NORTH BLOOMFIELD GRAVEL MINING Co. and others.[1]

*(Circuit Court, D. California.   January 7, 1884.)*

1. PUBLIC AND PRIVATE NUISANCE FROM MINING DEBRIS.

The Yuba river rises in the Sierra Nevada mountains, and after flowing in a westerly direction about 12 miles across the plain after leaving the foot-hills, joins the Feather. At the junction, within the angle of these two rivers, is situated the city of Marysville. The Feather thence runs about 30 miles and empties into the Sacramento. These three rivers were originally navigable for steam-boats and other vessels for more than 150 miles from the ocean, at least as far as Marysville—the Sacramento being navigable for the largest-sized steamers. The defendants have for several years been and they are still engaged in hydraulic mining, to a very great extent, in the Sierra Nevada mountains, and have discharged and they are discharging their mining *debris,*—rocks, pebbles, gravel, and sand,—to a very large amount, into the head-waters of the Yuba, whence it is carried down, by the ordinary current and by floods, into the lower portions of that stream, and into the Feather and the Sacramento. The *debris* thus discharged has produced the following effects: It has filled up the natural channel of the Yuba above the level of its banks and of the surrounding country, and also of the Feather below the mouth of the Yuba, to the depth of 15 feet or more. It has buried with sand and gravel and destroyed all the farms of the riparian owners on either side of the Yuba, over a space two miles wide and twelve miles long. It is only restrained from working a similar destruction to a much larger extent of farming country on both sides of these rivers, and from in like manner destroying or injuring the city of Marysville, by means of a system of levees, erected at great public expense by the property owners of the county and inhabitants of the city, which levees continually and yearly require to be enlarged and strengthened to keep pace with the increase in the mass of *debris* thus sent down, at a great annual cost, defrayed by means of special taxation. It has polluted the naturally clear water of these streams so as to render them wholly unfit to be used for any domestic or agricultural purposes by the adjacent proprietors. It has filled to a large extent, and is filling up the bed and narrowing the channels of these rivers, and the navigable bays into which they flow, thereby lessening and injuring their navigability, and impeding and endangering their navigation. All these effects have been constantly increasing during the past few years, and their still further increase is threatened by the continuance of the defendants' said mining operations. *Held,* that these acts, unless authorized by some law, constitute a public and private nuisance, destructive, continuous, increasing, and threatening to continue, increase, and be still more destructive.

2. SPECIAL INJURIES TO THE COMPLAINANT.

During all this time the complainant was and he now is owner in fee of a block of buildings in Marysville, in the business portion of the city, about 500 feet from the levee on the Yuba. Originally the steam-boat landing for the city was on the Yuba, nearly opposite to this block, but by reason of the filling up of that river its navigation has been prevented, and the landing is now in the Feather, three-fourths of a mile distant from said block. By a break in the levee of the Yuba during one of its annual floods, the city of Marysville was inundated, the water stood several feet deep in this block, *debris* was deposited in it, its underpinning was washed out so that the roof fell in, and the repairs of these injuries cost between $2,000 and $3,000. The building is liable in the same manner to similar injuries from every flood in the river. The complainant also owns two farms,—one of 952 acres, abutting on the Feather a few miles below Marysville, upon which there was formerly a public steam-boat landing for shipping and receiving freight and passengers, but which has become useless by the filling up of the river in front; the other of 720 acres, abutting on the opposite bank of the Feather. Seventy-five acres of one of these tracts and 50 acres of the other have been completely buried and destroyed by the *debris,* and

[1] See S. C. 16 FED. REP. 25.

the remaining portions are only protected from destruction by the levees, which on several occasions have broken, and the lands have been damaged by water charged with *debris*, and they are in danger of being overflowed and injured in a similar manner from a breach of the levees at any flood. The value of the complainant's land has been depreciated from these causes; his access to the river from his farms for the purpose of shipping or receiving freights has been cut off; he has been obliged to pay an extraordinary, onerous, annual tax for the erection and maintenance of the levees to protect his property from the constantly increasing danger of loss or destruction. *Held*, that these facts constitute special injuries to the complainant, which entitle him to maintain a suit in equity to restrain the further commission of the public nuisance created by the defendants.

3. SUIT BY A PRIVATE PERSON TO RESTRAIN A PUBLIC NUISANCE.

When a private person has sustained special injuries from a public nuisance, he thereby gains a standing in court which enables him to maintain a suit for such injury. In the suit so brought the plaintiff acts on behalf of all others who are or may be injured, as a public prosecutor rather than on his own account. The court, in deciding such suit, has regard to the interests of the public, as well as to those of the plaintiff.

4. SUCH NUISANCE NOT AUTHORIZED BY LEGISLATION.

The acts of defendants creating such a public and private nuisance are not authorized or justified by the legislation of congress recognizing, permitting, and regulating mining on the public lands of the United States, or on lands granted by the government to private owners, (Rev. St. § 2338, Act of 1866;) or by statutes providing for the improvement of the navigable rivers of California, which recognize the injuries above described as existing facts (river and harbor bills of 1880 and 1882;) or by the legislation of California regulating mining operations, or purporting to permit the condemnation of lands for the uses of miners, (Code Civil Proc. § 1238, subd. 5;) or by the act of 1878, (section 1, subd. 8,) concerning the Sacramento and San Joaquin rivers, and recognizing the injuries as above described from the mining *debris*.

5. NUISANCES NOT AUTHORIZED BY IMPLICATION.

Under the provisions of the California Civil Code, § 3482, defining nuisances, acts otherwise constituting a nuisance cannot be justified and legalized by implication, but only by the express authority of some statute.

6. STATUTORY RIGHTS—CONDITIONS IMPLIED.

It is a condition always implied by law, that rights granted or regulated by statute shall be exercised by their possessors with due regard to the rights of other persons.

7. POWERS OF THE UNITED STATES OVER PUBLIC LANDS WITHIN A STATE.

Over the public lands within a state the United States has only the rights of a proprietor, and it has no power to authorize its grantees of such lands to invade the private rights of other proprietors.

8. POWERS OF CONGRESS OVER NAVIGABLE STREAMS.

Congress has no power, even by express statute, to authorize a public nuisance destroying or materially obstructing the navigability and navigation of navigable streams within a state, for purposes wholly unconnected with commerce or post-roads. Its power over such streams is limited to the regulation of commerce and establishing post-roads, and it cannot authorize the navigability of a navigable stream to be totally or partially destroyed for purposes having no connection with or tendency to benefit the operations of commerce or the carrying of the mails.

9. POWERS OF THE STATE TO AUTHORIZE SUCH A NUISANCE.

A statute of the state of California expressly authorizing the acts of the defendants, and the injuries caused by them, would be in conflict with the fourteenth amendment of the United States constitution, and with similar provisions of the state constitution. Such legislation would either deprive the complainant and others of their property without due process of law, or would take or damage their property for alleged public use without compensation.

10. POWERS OF THE STATE OVER NAVIGABLE STREAMS.

A state cannot, except under its power of eminent domain, and upon making just compensation, interfere with the navigable streams within its terri-

tory, in any manner, or for any purpose, other than that of regulating, preserving, and protecting the public easement of navigation therein.

11. ACT ADMITTING CALIFORNIA INTO THE UNION.

The provision of the act admitting California into the Union "upon the express condition  *  *  *  that all the navigable rivers within said state shall be common highways and forever free as well to the inhabitants of said state as to the citizens of the United States," is valid as a law under the authority of congress to regulate commerce, which the state has no authority to violate, and with which it cannot interfere.

12. PRESCRIPTION, NATURE OF.

The statute of California merely fixes the time in which a right by prescription shall be acquired at five years; but it nowhere determines the circumstances which constitute prescription, and thus leaves them to be determined by the settled law as it stood prior to the Code.

13. NO PRESCRIPTION IN FAVOR OF A PUBLIC NUISANCE.

No right or title can be acquired by prescription to commit or continue a public nuisance.

14. SAME, IN SUIT BY A PRIVATE PERSON.

The same doctrine applies to a suit brought by a private person who has sustained special injuries from a public nuisance, as to a suit brought by the attorney general, or by some corporate portion of the public. A public nuisance is not unlawful as to the whole public and lawful as to its constituents; it is absolutely and wholly unlawful.

15. NO PRESCRIPTIVE RIGHT ACQUIRED.

The defendants have acquired no right or title by prescription to commit or continue the nuisance complained of, whether regarded as a public or a private nuisance; there has been no acquiescence, either by the public or by complainant, in the acts of defendants as done under an adverse claim of right.

16. DELAY AS EVIDENCE OF ACQUIESCENCE.

How far delay may be evidence of acquiescence must depend upon the circumstances of each case. In the present case, the complainant is entitled to the benefit of the conduct of the community, and this conduct shows a constant opposition on their part to the acts of defendants during the whole period of their hydraulic mining operations, since the injury became material. Acquiescence in a certain amount of nuisance is not acquiescence in a similar nuisance which is constantly increasing in magnitude, and in its destructive effects. For the same reasons, the delay or lapse of time in bringing this suit does not constitute laches.

17. ADVERSE POSSESSION.

Defendants have not acquired title by adverse possession to the two tracts of complainant's lands—one of 75 acres, the other of 50 acres—which have been completely buried by their mining *debris*. These tracts have not been "protected by a substantial inclosure," or "usually cultivated or improved" by defendants, as required by the Code of Civil Procedure, § 325, in all cases where the adverse possession is "not founded upon a written instrument, judgment, or decree," and there has been no ouster of the complainant by defendants.

18. CUSTOMS OF MINERS.

The acts of defendants are not authorized by the "customs of miners" recognized by the legislation of California and of congress, which customs so recognized are only local, not general, customs. A custom which authorized such acts, if it existed, would be "in conflict with the laws and constitution of the state," and would be illegal and void.

19. INCONVENIENCE TO DEFENDANTS.

In granting relief, where the complainant's rights are certain, and the invasion of them is clearly established, a court of equity cannot consider the inconvenience which will result to defendants from the relief. Nor is it the province of the court to speculate upon or to consderi or to suggest any possible modes by which defendants may avoid the injurious consequences of their acts, or to decide upon the conflicting opinions of scientific experts concerning the feasibility or sufficiency of such suggested modes. The only duty of the court is to grant the relief to which the complainant is entitled upon the law and facts of the case.

Bill in Equity for an Injunction.    The opinion states the facts.

*George Cadwalader, I. S. Belcher,* and *John N. Pomeroy,* for complainant.

*Stewart & Herrin, J. K. Byrne,* and *W. C. Belcher,* for defendants.

SAWYER, J.    This is a bill in equity to restrain the defendants, being several mining companies, engaged in hydraulic mining on the western slope of the Sierra Nevada mountains, from discharging their mining *debris* into the affluents of the Yuba river, and into the river itself, whence it is carried down by the current into Feather and Sacramento rivers, filling up their channels and injuring their navigation; and sometimes by overflowing and covering the neighboring lands with *debris,* injuring, and threatening to injure and destroy, the lands and property of the complainant, and of other property owners, situate on and adjacent to the banks of these water-courses. In March, 1882, the secretary of war transmitted to congress the official report of Lieut. Col. Mendell, of the "corps of engineers, upon examinations and surveys to devise a system of works to prevent the further injury to the navigable waters of California from the *debris* of mines arising from hydraulic mining," which surveys and report were made in pursuance of the act of congress relating to rivers and harbors, of June 14, 1880.    This report, made in January, 1882, was introduced in evidence, and it has been quoted and recognized by both sides in the case as showing the injurious results of hydraulic and other mining up to its date, and the remedies attempted and suggested.    It is also fully confirmed by the other evidence in the case, and by the condition of things as disclosed upon actual inspection and observation made by the judges who traversed and examined the country affected by the operations complained of, in the presence and with the consent of representatives of the respective parties and their counsel.    Many of the facts in the general statement will, therefore, be taken in a condensed form from that report.

Hydraulic mining, as used in this opinion, is the process by which a bank of gold-bearing earth and rock is excavated by a jet of water, discharged through the converging nozzle of a pipe, under great pressure, the earth and *debris* being carried away by the same water, through sluices, and discharged on lower levels into the natural streams and water-courses below.    Where the gravel or other material of the bank is cemented, or where the bank is composed of masses of pipe-clay, it is shattered by blasting with powder, sometimes from 15 to 20 tons of powder being used at one blast to break up a bank.    In the early periods of hydraulic mining, as in 1855, the water was discharged through a rubber or canvas hose, with nozzles of not more than an inch in diameter; but later, upon the invention of the "Little Giant" and the "Monitor" machines, the size of the nozzle and the pressure were largely increased, till now the nozzle is from four to nine inches in diameter, discharging from 500 to 1,000 inches of water under a pressure of from three to four or five hundred feet

For example, an eight-inch nozzle, at the North Bloomfield mine, discharges 185,000 cubic feet of water in an hour, with a velocity of 150 feet per second. The excavating power of such a body of water, discharged with such velocity, is enormous; and, unless the gravel is very heavy or firmly cemented, it is much in excess of its transporting power. At some of the mines, as at the North Bloomfield, several of these Monitors are worked, much of the time, night and day, the several levels upon which they are at work being brilliantly illuminated by electric lights, the electricity being generated by water power. A night scene of the kind, at the North Bloomfield mine, is in the highest degree weird and startling, and it cannot fail to strike strangers with wonder and admiration. The amount of *debris* discharged into the rivers by these operations can only be duly appreciated by actual observation.

The Yuba river is a tributary of Feather river, entering it at Marysville, 30 miles above the mouth of the Feather, where the latter joins the Sacramento. It is the fourth river in size in the Sacramento valley, and drains about 1,330 square miles of the western slope of the Sierra Nevada mountains, comprising portions of Sierra, Nevada, and Yuba counties,—its extreme breadth being about 36 miles, and its extreme length about 60 miles, excluding the 12 miles of its lower course from the foot-hills to its junction with Feather river at Marysville. The elevation of the Yuba basin above tide-water is from 200 feet at its lower parts to about 8,000 feet at the summit of the mountains; but the gold deposits of this basin only extend to an elevation of from four to five thousand feet, in a belt from 40 to 50 miles wide. The upper portion of the river is divided into five principal branches, —the north, middle, and south Yubas, and Deer and Dry creeks. The first four—Deer creek being nearly as large as the smallest main branch—unite in the mountains before reaching the valley; Deer creek, not far from it; the last, Dry creek, joining the main river in the valley, shortly after it leaves the foot-hills. The *debris* complained of is mostly discharged into the middle and south Yubas and Deer creek, and their numerous smaller tributaries.

The auriferous deposit on the San Juan ridge, between the south and middle Yubas, embracing most of defendants' mines,—and a larger part of the mines now actually worked being under their control,—is much the largest and most important in the state, and is favorably situated for working; the beds of the ancient channels in which it lies being elevated several hundred feet above the beds of the Yubas and their affluents, and the annual floods of the Yuba may be relied on to carry off a large portion of the *debris* resulting from mining. Says the report referred to:

"The linear extent of the gravel channel and its branches on this ridge is about twenty-five miles. Deducting liberally for the portion already worked, and for that too deeply covered by lava to be available for hydraulic mining, there remain, probably, not less than fourteen miles of channel available for

washing, from which only a comparatively small portion of the top gravel has been removed. Below San Juan the gravel body has a surface width of over one thousand feet, and is, say, one hundred and forty feet deep. From Badger Hill to Bloomfield, it is for the greater portion very much wider and deeper. At Columbia Hill, its surface width varies from three thousand or four thousand to eight thousand feet, and it is from three hundred to six hundred feet deep. The gravel at Lake City is probably three hundred or four hundred feet deep. At North Bloomfield it is opened to the bed-rock, showing a depth of more than three hundred feet. Roughly estimating the average width of the remaining gravel range at four hundred yards, and, after allowing for the portion worked off, placing its average depth at seventy yards, the sum is an average of, say, fifty million yards per mile, or, for fourteen miles, say seven hundred million yards."

"Allowing for the amount washed since 1876, one hundred million yards, there remain six hundred million to be removed;" adding to this the estimated amount still remaining to be worked at Smartsville, lower down the river, and the amount remaining to be washed will appear. Says Col. Mendell: "Seven hundred million of cubic yards may be assumed to represent the amount of gravel remaining to be worked by hydraulic process, tributary to the Yuba." Approximately, then, according to the evidence, over 100,000,000 of cubic yards in these mines have been washed out by the hydraulic process, and the *debris* deposited in the Yuba and its affluents; and 700,-000,000 more remain to be washed out, and its *debris* deposited in these water-courses in the same manner.

The following shows some of the results of former washings, and unmistakably indicates what must result from a continuance of the work. The Yuba, with its branches and smaller affluents, were necessarily characterized by heavy grades, the waters falling about 8,000 feet in a distance of 90 or 100 miles from their extreme sources to the Feather river. They ran through deep, rocky canyons and gorges, over a rough rocky bottom, with frequent rapids, and water-falls of greater or less height, and there were many deep holes excavated by the action of the water at the foot of falls, rapids, and the like. The beds of all these streams, from the very dumps of the higher mines to the junction of the main Yuba with Feather river, a distance of 75 miles or more, have all been filled up many feet deep,—at some places to the depth of 150 feet,—and all the streams have regularly graded themselves, so that a railroad track might be laid upon their beds for the whole distance,—the grade, of course, being steeper in the upper parts, but equally regular.

Thus, the main branches of the Yuba and Deer creek, Shady creek, Bloody run, Grizzly canyon, Humbug canyon, and the other smaller tributaries, all exhibit this result. There are many square miles, in the aggregate, in the beds of these streams, buried many feet deep with *debris*, and these channels are choked and clogged with it,—the heavier material being deposited higher up and the lighter passing further down. Most of it will from year to year be carried further down, and ultimately find its way to the valley. The transporting

capacity of the water, however, is unequal to the task of carrying off all the *debris* at once, as it is discharged into the stream.   So, also, the ordinary floods, from year to year, are unable to carry off all the *debris* discharged into the streams during the year, and it consequently accumulates from year to year along the upper portions of the water-courses, within the mountains, till an extraordinary flood comes.   When such a flood occurs, it transports a much larger amount at once, and precipitates it upon the valleys below.   Vast amounts are now accumulated in the upper courses of the Yuba and its branches, which are liable to be precipitated in immense quantities into the valleys below by any extraordinary flood—such as that of 1862—that may hereafter occur.   With reference to the amount of these deposits remaining in the Yuba above Marysville, Col. Mendell, in his report, says:

"The estimates by Mr. Manson, reported to the state engineer, give the estimated deposits in 1879, on the Yuba, above the foot-hills, as forty-six million four hundred and sixty-two thousand one hundred cubic yards, the great bulk in eight or ten miles; and below, twenty-three million two hundred and eighty-four thousand,—a total of seventy-one million seven hundred and forty-six thousand one hundred cubic yards.   In the light of later information, it seems probable that this estimate is altogether too low, the deposits in small tributaries not having been taken into account, and the amount in the lower river having been much underestimated.   The *actual amount is not capable of being ascertained, and the statements are given merely for the purpose of illustration.*   At its escape from the mountains, where the foot-hills recede and give width to the plain, the Yuba spreads out its *load of sand and gravel* over a plain of fifteen thousand to sixteen thousand acres, which has risen until it now *stands above the level of the adjoining country on either side.*   This plain has a slope of about ten feet to the mile, varying above and below this limit as you ascend or descend, the slope of the river-bed being fifteen feet at the foot-hills and five feet at Marysville, ten miles below.   The sizes of material have some correspondence to the grades.   Ascending the stream, one passes to a continually increasing average size of material.   While it is nearly all sand below, above it becomes nearly all gravel, with, however, considerable admixture of different sizes everywhere.   This irruption from the mountains has *destroyed thousands of acres of alluvial land.*   The state engineer, in 1880, estimated that fifteen thousand two hundred and twenty acres had been seriously injured by these deposits from the Yuba.   On the Yuba, the great deposts of *gravel* are found on a grade of thirty feet to twenty feet to the mile.   The *sands* predominate greatly in slopes of ten feet and below."

The portion of the valley here referred to as covered with sand is that portion of the borders of the Yuba river extending across the Sacramento valley from the foot-hills to its junction with Feather river at Marysville,—a distance of about 12 miles.   Formerly, before hydraulic mining operations commenced, the Yuba river ran through this part of its course in a deep channel, with gravelly bottom from 300 to 400 feet wide, on an average, with steep banks from 15 to 20 feet high, at low water, on either side.   From the top of the banks, on each side, extended a strip of bottom lands of rich, black, alluvial soil, on an average a mile and a half wide, upon which were situate

some of the finest farms, orchards, and vineyards in the state. Beyond this first bottom was a second bottom, which extended some distance to the ridge of higher lands, the whole constituting a basin between the higher lands on either side of from a mile and a half to three miles wide. Not only has the channel of the river through these bottoms been filled up to a depth of 25 feet and upwards, but this entire strip of bottom land has been buried with sand and *debris* many feet deep, from ridge to ridge of high land, and utterly ruined for farming and other purposes to which it was before devoted, and it has consequently been abandoned for such uses.

Dr. Teegarden's lands afford a very striking example of individual injuries inflicted by this mining *debris*. Dr. Teegarden is a prominent citizen of Yuba county, having for some years represented the county in the state senate. He owned 1,275 acres on the Yuba bottoms, some three or four miles above Marysville, on the north side. All except the 75 acres now lying outside the levee have been buried from three to five feet deep with sand, and utterly destroyed for farming purposes; for which injuries he has received no remuneration. He now lives in a small house near the levee, on the outside, which is liable to be swept away should the levee break opposite to him during an extraordinary flood. Dr. Teegarden testifies that the main filling up was in 1879 and 1880; but that there has been a constant addition to it ever since, and that, during the last year, it has filled up faster than at any other time; that he built three miles of levee to protect it, but it proved insufficient; and that the land is five to six feet higher with sand and sediment on the river, or inside of the levee, than on the outside, where he lives.

A considerable portion, but not all, of the lower bottoms of the Yuba was covered by the accumulated *debris* brought down by the great flood of 1862; but it has been extending and deepening ever since. Much, perhaps most of it, was more or less covered as early as 1868 or 1869. Since that time levees have been built by the citizens of Marysville and Yuba county along the ridge on either side, for the purpose of preventing a further spread of the devastation, and for the protection of Marysville and the adjacent country. In addition to the levees so erected, as O'Brien, who did the work, testifies, the miners themselves five years ago also built a levee for the same purpose, being the levee on the south side of the Yuba, from the foothills to the Hedges grade, with which it connected at Hedges' station, a distance of eight miles, at a cost of $86,000, of which sum the defendants in this suit paid 80 per cent. This is the levee which, connected with Hedges' grade from its connection to the Feather river, protects the country from overflow on the south. It broke in three places in Linda township, in June last, when the English dam gave way, and the country for a considerable distance below, extending to the Eliza tract, several miles distant, was flooded, with some, though not great, damage,—the flood from the reservoir having soon

spent itself.   Not only has all the space between these levees been filled with this *debris* to a level with the highlands upon which they are built, but for miles of the lower portion of the river the filling between the levees is several feet above the level of the surrounding country on the outside.   The intervening space is grown up with young cottonwoods and willows.   The river has now no definite channel within these bounds, but runs anywhere over the space between the levees, situate two to three miles apart, according to the obstructions its waters meet from time to time by growing trees, or accumulations of drift-wood, or deposits made by itself, thereby raising the bed, where it actually for a time runs, to a higher level than the bed of such surrounding channel as it has.   This broad channel or bed, such as it is, is several feet higher than the lands of the surrounding country outside the levees, which outside lands have no protection from overflow of the waters of the Yuba, surcharged with *debris*, except the slender intervening artificial banks so erected by the people and the miners for that purpose.   The lands thus already buried and destroyed are over 15,000 acres, or 25 square miles; or, taking the average width, a tract from the foot-hills to Marysville, twelve miles long along the river by two miles wide.   The filling in the river bed is generally 25 feet or more, and, at its immediate junction with Feather river at Marysville, is about 20 feet deep, —some witnesses make it deeper,—where it forms a bar of nearly that depth across Feather river.   The depth of the filling is increasing year by year, and raising the bed of the river within the levees higher and higher above the surrounding country outside the levees. The depth of the filling increases as the river is ascended, till at Squaw flat, near Park's bar, below Smartsville, at the entrance of the foot-hills, according to the testimony of O'Brien, a witness for defendants, it is 150 feet deep.   Opposite Sucker-Flat ravine it is 90, and at the narrows above Smartsville, 60 feet deep.   The deposits constituting the first 50 feet, at Squaw flat, have been there 10 or 12 years, and the rest has accumulated since.   At a point near this, at Rose's bar, where the channel was once but 100 to 300 feet wide in the bed of the canyon, it has now been raised by filling till it is 3,000 feet wide.   But at these points no valuable lands are covered.

The result, as affecting the navigability of the waters of the state, will be stated upon the authority of Mendell's report, which was made upon instrumental surveys and actual measurements, and is amply supported by other evidence.   The low-water level of Feather river, at Marysville, the head of navigation, at the date of his report, had been raised fully 15 feet,—at this time it is more,—indicating a rise of the bed of the river to that height above its former bed.   The filling at the mouth of the Feather river is fully five feet.   Says Mendell:

"Taking fifteen feet at Marysville and five feet at the mouth, the difference—ten feet—is to be added to the old fall.   This increases the slope of

the Feather, in its navigable part, four inches to the mile. This increase has impaired the depth of water and the practicability of navigation to a considerable extent. Applying to the navigable portion of the Feather the rule adopted for the minimum deposit in the Sacramento, namely, that the average filling is equal to the elevation of the plane of low water, we will have, for the thirty miles from Marysville to the mouth, an average depth of ten feet over the bed of the river. This estimate is thought to be here, as in the Sacramento, *considerably below the fact.*"

Some witnesses say it is now 15 feet. Again:

"As a consequence of these changes, a higher flood line and *greater exposure to overflow now exists for all riparian lands on both these rivers. This is an element of considerable loss to the country,* but its description and discussion do not come within the limits of this investigation. * * * The elevation of the bed of the river is not accompanied by an equal rise in the level of the banks. *The level of the beds approaches, more and more, the level of the banks.* In the cases of the Yuba and Bear, non-navigable streams, the level of the beds has risen from a depth a number of feet below the banks to an *elevation of several feet above the banks.* These instances may be taken to illustrate the ultimate condition of the Sacramento and Feather rivers, under a continuance of the influences to which they are now subjected. The abandonment of existing channels *is a consequence to be apprehended.*"

It is claimed by plaintiff, and the testimony on the point is conflicting, that there is danger of the Sacramento leaving its channel at Gray's bend and running some distance from Sacramento city to the west. In the Sacramento river a similar rise in its bed has taken place, from similar causes. During the first 20 years of mining, from 1849 to 1869, the low-water plane in the river at Sacramento was raised two and nine-tenths feet. During the next 10 years of *hydraulic mining, from 1869 to 1879, the rise in this plane was doubled.* It has been raised fully *six feet from 1849 to 1881.* Says Mendell:

"As a consequence of the elevation of the bed, the tidal influence which, in 1849, extended at least as high as *the mouth of the Feather, twenty-five miles above Sacramento, and was quite two feet at Sacramento, is now no longer noticeable above Heacock shoals, nine miles below Sacramento.* The tide, within the past thirty years, rose on these shoals as much as three feet. * * * Twenty-five miles below Sacramento the river divides into two delta channels, which unite below, the intermediate distance by the two channels *being eighteen miles by Old river and twelve miles by Steam-boat slough.* In the earlier days of navigation, and until six or eight years ago, [before 1881,] Steam-boat slough was the channel used by all boats and vessels."

It is a part of the public history of the state, with which all the early settlers are familiar, that for years the comparatively deep-draught steamers, Senator and New World,—the former built to run from New York to Portland, Maine, and the latter to run on the Atlantic ocean out of New York, both of which either came round Cape Horn, or through the straits,—ran *regularly through Steam-boat slough.* This slough is now filled up, so as not to be navigable for the light-draught river boats in use at the present day, and its navigation abandoned, steamers going by the longer route of Old river. The

beds of the river have not only been filled and raised for several feet, but the channels have been largely contracted in width. So, also, from similar causes, the shoal water in Suisun, San Pablo, and San Francisco bays, and in the straits of Carquinez, have largely increased, and the navigable channels of these waters have been considerably and materially contracted. The *debris* from Bear river and the American of course contribute their share to fill the Sacramento below the mouth of the American and Steam-boat slough, as do some of the southern rivers, to swell the amount of deposits in the straits of Carquinez, and Suisun, San Pablo, and San Francisco bays, but the mines of the Yuba discharge a much larger amount of *debris* than all the other mines together.

In speaking of remedial means, Col. Mendell says:

"The statement of the case presented in the preceding pages seems to establish the necessity of measures of remedy or alleviation, *even in the event that no further contribution be made to mining detritus in the beds of streams.* \* \* \* The preservation of river beds and routes of drainage requires that effective restraint be imposed upon mining *detritus.* Otherwise, these drainage lines may be expected to suffer the fate which overtook their prototypes, the Pliocene rivers, which were obliterated by enormous deposits brought down by their own currents. It may be added that the conservation of existing facilities for navigation equally requires restraint of the flow of sand and gravel; and *that no important improvement of the channels can be expected until this result shall be secured.* Under all circumstances, restraint is the first and essential step to any projects, whether of alleviation, conservation, or improvement. It has been shown that in the beds of the American, Bear, and Yuba there are now lying many millions of cubic yards of material in positions where it is comparatively harmless, and that each yard, as a rule, adds something to the volume of these deposits; but that, whether anything is added or anything subtracted, which is sometimes the case, depends upon the volume and power of the floods. As a rule, the mines supply more material annually than the floods are able to transport over the grades in the lower portions of the rivers. If the floods were of sufficient duration, the accumulations would be found lower down and in more dangerous positions. Instead of lying in the bed of the Yuba, they would be in the Feather and Sacramento."

The waters of the Yuba are so charged with *debris* that they are wholly unfit for watering stock, or for any of the uses, domestic or otherwise, to which water is usually applied, without being first taken out of the stream and allowed to stand in some undisturbed place and settle. As it comes down to Marysville it is so heavily charged with sand as to render it unfit even for surface irrigation.

In pursuance of the provisions of the drainage act of 1880, (St. 1880, p. 130,) the state, under the supervision of the state engineer and Col. Mendell, as consulting engineer, erected a brush dam for impounding *debris*, about two miles in length across the Yuba river, from ridge to ridge of highlands, some eight miles above Marysville. At the first ordinary flood in the following rainy season, a large section on the northerly end and two other sections towards the south were swept away. According to the report of Hamilton

Smith, its engineer, to the North Bloomfield Company, made in July, 1881, after the break by the floods, this dam was at its greatest height, 14 feet, "its cost being in the neighborhood of one hundred and twenty thousand dollars," and it broke in three places, as follows: "The east embankment at the northern end has been washed away, nearly down to the original level, from the end of the brush work to the shore, a distance of four hundred feet; the brush dam. nas been cut away entirely in two places,—one seven hundred and sixty feet, and the other two hundred and thirty feet in length, measured on the crest.   In two places there are small gaps, but the foundation is undisturbed.   Out of a total length of ten thousand feet, there has, therefore, been destroyed about one-seventh." Afterwards, during the dry season, the dam took fire, and a large portion of the remainder was burned.   An impounding dam was also constructed by the state, under the same act, on Bear river, with similar results.   These dams, with connecting and auxiliary levees built by the state, are understood to have cost over $500,000.

The North Bloomfield Mining Company, defendant, has constructed a dam to impound its *debris*, 50 feet high, near the junction of Humbug canyon with the south Yuba.   The dam, not having been carried higher as it filled up, is now full, and the *debris* that has passed over the dam has filled the canyon and the south Yuba below the dam to a level with the *debris* above, so that now the *debris* passes along down the canyon over the dam without obstruction, as though no dam at all existed at that point.   A similar dam erected across Sucker-Flat ravine, at Smartsville, to impound the *debris* of the mines at that place, is in a similar condition.

The complainant has owned in fee for more than 20 years, and he he still owns, an undivided half of three parcels of land, held under a patent of the United States, issued upon a grant made by the Mexican government to John A. Sutter, and known as the New Helvetia grant. One is a city lot situated in Marysville, at the corner of D and Second streets, near the business center of the town, and about 500 feet from the levee on the Yuba, which lot is covered by a brick block of stores, called the Empire block, erected about 1854 or 1855, at a cost somewhere between $40,000 and $60,000.   Formerly the steam-boat landing was in the Yuba, nearly opposite this block, just below the ferry, on the Sacramento road, but now the Yuba is filled up, and the steamboat landing is in Feather river, opposite Yuba City, which is in Sutter county, three-fourths of a mile distant.   Another is a tract of farming land, consisting of 952 acres, situate on the east bank of Feather river, a few miles below Marysville, known as the Eliza tract, upon which there was formerly a public steam-boat landing, used for receiving and discharging freight and passengers; but by reason of the filling of the river in front to the depth of 12 to 15 feet, it is now of little use.   The third is a tract of land of 720 57-100 acres, known as the Hock Farm tract, on the western bank of Feather river, not

far from the Eliza tract, but on the opposite side of the river.   Of the Eliza tract, 75 acres, and of the Hock Farm tract, 50 acres, of the bottom lands, being the best land on these tracts, were buried by *debris* in 1862 and subsequent years, and they are still covered, from time to time, with fresh deposits.   These lands have become covered with cottonwood and willows, and they are now useless for agricultural purposes.   Other portions of these tracts are still within the levees erected, and liable to overflow.

About 1868 the people of Marysville found it necessary to build levees around the city and along the north bank of Yuba river to protect it from the rapid encroachment of the *debris* coming down the Yuba; and levees were built.   It has been found necessary to increase these levees in height and thickness from year to year ever since.   In 1875 the levee on the north side of the Yuba broke, some three or four miles above the city, and the city and other lands were not only flooded, but a large amount of *debris* was deposited.   This was the first time Marysville was ever flooded, although the amount of water that fell, or was in the valley at any one time, was much less than in the great flood of 1862.   So, in 1881, with much less water than at the great flood, it rose to a higher point at Marysville than ever before.   This was doubtless owing in great part to the filling up of the channels and elevation of the beds of the rivers, and probably, in part, also, to the general levee system adopted for the protection of the lands of the valleys.   At the break of the levee and flooding of the city of Marysville, in 1875, complainant's Empire block, in Marysville, was materially injured.   The water was over four feet deep in it, and *debris* from the Yuba was deposited in it to a considerable depth.   The underpinning of the center of the building was washed out, and the roof fell in.   It cost between $2,000 and $3,000 to put it in repair again.   Not only this building, but many others, had valuable basements, in use prior to 1875, which were filled at that time, and since then the owners of basements in Marysville have been compelled to abandon their use.   The level of the bed of the Yuba and the water flowing in it having been elevated by these mining deposits above the level of the floors of basements of the buildings in Marysville, the water in the basements rises and falls with the river, to a greater or less extent, from percolation, rendering them unfit for use, and compelling their abandonment.   So, also, the sewerage of Marysville, and of Empire block, has been greatly obstructed and injured by the same means.   In 1881 the water is stated by some of the witnesses to have been four feet higher than in 1875, and eight feet higher than the great flood of 1861–62.   The trestle-work of the D street bridge in 1876 was 10 to 12 feet above the ground. Now it is filled so that it is within two or three feet of the water, and one can step from the trestle-work to the bed of the stream; and in 1881 the flood went over the bridge, depositing gravel on it.   In 1881 the inhabitants were called out in the night to increase and strengthen

the north levee, and only by the most strenuous exertions of those able to work in raising the levees several feet in places, by means of gunny-sacks filled with sand, did they escape a break and inundation of water and sand.

The taxes of the citizens of Marysville from year to year amount to from 2 to 7 per cent. upon the assessed value of their property, a large part of which is expended upon their levees, to widen and strengthen them, and to increase their height,' as the height of the *debris* within the levees is increased. The levee tax alone in Marysville, and in Sutter county, opposite, in some instances has been as high as 6 per cent. During the present year a large amount has been expended by the city on the levee on the north side of the Yuba. For some miles there have been thrown out jetties every few yards, at an angle down stream, by means of timbers and poles resting on supports fastened to the earth, covered with willow brush, and packed with sacks filled with sand,—the object being to check the flow of the current, turn it from the bank, so as to prevent its cutting it away, and by deadening the current compel it to deposit its *debris* in the still water, and thus aid in widening and strengthening the levee itself. For all these purposes, and to protect his property, complainant annually pays large taxes that would otherwise be unnecessary. This levee is the only barrier which prevents the waters of the Yuba within the levee, the bed of which is higher than the' lands outside, at flood-time from flowing over, loaded with sand to their full carrying capacity, and depositing their *debris* in Marysville, and from at all times flowing over and depositing their load of sand and other *debris* upon the surrounding country, which is now for some miles around below the level of the bed of what channel there is within the two levees. In 1881 the south levee broke in Linda township, seven miles above Marysville, and ran down over the country for several miles, flooding complainant's Eliza tract, which was under water till June, preventing the raising of a crop for that year. Any breaking of the south levee during a flood sends the water down to the Eliza tract and overflows it, unless the small private levee built by the occupant, the tenant of complainant, at his own expense, is sufficient to protect it.

In June last (1883) the English dam, near the summit of the mountains, which forms the reservoir of one of the defendants, gave way, and the accumulated waters came down the Yuba in a torrent, sweeping everything before them, a distance of 85 miles in about 10 hours, rising at some places, in its canyons, it is said, to a height of 90 feet; and at Marysville, where the channel is broad, two and a half feet. At Linda, seven miles above Marysville, meeting some obstruction, its current was turned against the south levee, which broke at three points, the water rushing through and down over a broad stretch of the lower plains outside, to and upon the Eliza tract again. The water having run out of the reservoir in an hour, the

torrent soon spent itself, and no considerable damage was done to the Eliza tract, although considerable damage resulted to the intervening lands.   In this case, however, the small private levee constructed by the tenant of Woodruff, for the protection of this and other lands held by him, would have protected this tract from this brief flood had there not been a culvert, the gate of which the proprietor refused to have shut, giving as a reason that he desired to show his neighbors, who refused to contribute to the expense of building this private levee, that their lands were in danger without it.   Had the rivers all been high, and this torrent continued for several days, as sometimes happens from natural causes, there is no knowing what the result would have been.   These torrents sometimes happen in nature on these mountain water-courses, as, for instance, in 1862, when the Sacramento river rose between 50 and 60 feet at Folsom; and in 1881 the Sacramento river cut its way down to its old bottom.   And they sometimes continue for several days.   So, in 1881, the Sutter levee broke below the mouth of the Yuba river, at Shanghai bend, one mile above Woodruff's land, and the river overflowed complainant's Hock Farm tract, washing off its soil in many places as deep as it has been plowed, and depositing sediment on it. One witness says gravel as large as hens' eggs passed through the break.   The Hock Farm tract was overflowed in 1862, 1867–68, 1871–72, and 1881—the later overflows being since the building of the levees.   The Hock Farm of complainant is one of the best in the county, producing large crops of grain, in which it has been cultivated for many years.   A mile below is O'Neil's landing, at which large amounts of grain used to be shipped.   This, like the Eliza landing, has been destroyed, or nearly so, by the filling in front from mining *debris.*

The defendants have attempted to show that much of the danger from overflows results from the acts of the people themselves, in consequence of the improper system of leveeing adopted, and the cutting off by such means of some outlets of water, available at high water. There is, as might be expected, some conflict in the testimony of experts and others on these points; but it is probable that they have not in all instances adopted the wisest plan possible in their efforts to protect life and property.   These works are always erected on the judgment of engineers, or other men presumed to be competent, and rarely without some difference of opinion, and it is scarcely possible that any plan wholly unobjectionable to all could be adopted.   However this may be, there can be no possible doubt, not only that the deposit of mining *debris* has greatly augmented the injuries heretofore received, but that it largely enhances the danger for the future, and that it is the great source and cause of all or most of the evils which are suffered and threatened.   The evils resulting from the occasional overflow of pure water, or water deteriorated only by na-

tural erosions and causes, and which leaves no deleterious sediment behind to permanently destroy the land, are trifling, compared with those resulting from the addition and deposit of the enormous amount of *debris* arising from hydraulic mining. At every break of the levees on the Yuba a heavy volume of water, charged to its full transporting capacity with sand and other deleterious material, is poured out and deposited on the lands over which it flows, where it remains, on the subsidence of the floods, to work out its destructive effects. If there were not a levee on the river, and not a slough cut off, the mining *debris* deposited in the navigable and non-navigable waters of the state, and burying the 25 square miles of land between the levees of the Yuba, would not only still be there, but many other square miles of the adjacent country would also be buried, but for the resistance interposed by the slender barriers erected by the people, including the complainant, at great, continuing, and ever-recurring expense, for their protection.

If the great and unexampled flood of 1862, by bringing down in one mass the accumulations of *debris* of previous years, did so much —as is claimed by the defendants—to fill the channel of the Yuba and cover the lower portions of its bottom lands, what must be expected should there be a recurrence of such a flood, bringing down the vastly larger accumulations with which the water-courses of the mountains are now choked and gorged, and precipitating it in a mass upon the deposits now between the levees, which are already several feet higher than the surrounding country, and which levees constitute the only barrier upon which Marysville and the adjacent country can rely for protection? A concurrence of conditions which produced such an extraordinary flood as that of 1862, which has once happened, is liable to occur again. That concurrence of conditions was high water in the Sacramento and all its affluents on the first of January, 1862; immense deposits of snow already existing in the mountains along the whole water-shed of the Sacramento and its tributaries; and a *general* rain warm enough to melt the snow on which it fell throughout the same region, continuing through many days, with only short intervals, whereby the rain that fell at the time, augmented by the water furnished by the rapidly melting snows, was precipitated into the valleys below, already full. Should there be a recurrence of such conditions in the present condition of the water-courses of the state, gorged with *debris*, no man can safely predict the result. To the most casual observer, even though but slightly acquainted with the operations of the forces of nature, the present condition of things, and the dangers to the residents of the valleys, that may reasonably be anticipated in the future, must be anything but assuring.

Unless the acts of the defendants complained of, in view of all their necessary consequences, are legal— nless they are authorized

by some valid law—it does not appear to us to admit of doubt or discussion that the results of those acts heretofore developed, still existing and operating, and certain to continue and increase in the future, as disclosed by the evidence and indicated by the preliminary statement of facts, constitute a grievous and far-reaching public nuisance, most destructive in its character, or, in the terse language of one of complainant's counsel, a nuisance, "*destructive, continuous, increasing, and threatening to continue, increase, and be still more destructive.*" Nor can there be any doubt that the complainant has suffered, that he is still suffering, and that by a continuance of those acts he will continue to suffer special injuries, peculiar to himself, of a character to entitle him to equitable relief. The nuisance is both public and private. If the unlawful filling up of the channel of a river, above the level of its banks and of the surrounding country, and burying with sand and gravel, and utterly destroying all the farms of the riparian owners on either side, over a space two miles wide and twelve miles long, along its entire course through the Sacramento valley, and across nearly an entire country; if the sand and gravel so sent down is, also, only restrained from working similar destruction to a large extent of farming country other than that already buried and destroyed, and from, in like manner, destroying or injuring, or contributing to destroy or injure, a city of several thousand inhabitants, by means of levees erected at great expense by the land and other property owners of the county, and the inhabitants of the city, such levees continually and yearly requiring to be enlarged and strengthened to keep pace with the augmentation of the mass of *debris* sent down, at a great annually recurring expense; and if the filling and narrowing, by similar means, of the channels of the largest and principal waters of the state, navigable for large vessels to the ocean, for a distance of 150 miles or more, to the injury of their navigation and danger of the riparian owners of the property—do not constitute a public nuisance of an aggravated character, then we confess that we do not know what a public nuisance is. So, also, if to unlawfully bury and destroy 125 acres of a private party's best land; to from time to time cause injury to his remaining lands and buildings, necessitating large expense for repairs, and to impose upon him annually an extraordinarily onerous tax for the purpose of strengthening and enlarging levees for the protection of that portion of his property still left him against the constantly augmenting dangers, as in the case of complainant—does not inflict a special injury, peculiar to that party, which entitles him to relief, then it would be difficult to say what kind of injury, arising from a public nuisance, would entitle a private party to relief at his own suit. The acts complained of, if unlawful, or, in the language of the Code of California, if not "done or maintained under the *express* authority of a statute," completely fill the definition given by the Code of a public nuisance, and also one for

which a private person injured by it may maintain an action. The provisions of the Code applicable are as follows:

"Sec. 3479. Anything which is   *   *   *   an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use in the customary manner of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

"Sec. 3480. A public nuisance is one which affects, at the same time, an entire community, or neighborhood, or *any considerable number of persons,* although the extent of the annoyance or damages inflicted upon individuals may be unequal.

"Sec. 3493. A private person may maintain an action for a public nuisance if it is specially injurious to himself, but not otherwise."

Are the acts, then, complained of lawful, or are they performed under the *express* authority of any valid statute? The counsel for the defendants, with a courage and confidence that challenge admiration, plant themselves upon the position that they are lawful, and so authorized; and they maintain this position with extraordinary earnestness and ability. They are met upon the other side by arguments equally earnest, elaborate, and able. The vast storehouse of authority upon the subject of nuisances has been exhaustively cited, examined, and elucidated in the masterly arguments of the respective counsel. Everything to be desired for ascertaining and elucidating the law applicable to the facts of a case of such vast importance to the real litigants has been done by counsel. While we have examined with care the numerous authorities brought to our notice, we shall content ourselves with stating the results of our examination, without commenting at length upon or even citing many of them.

Defendants allege that both congress and the legislature of California have authorized the use of the navigable waters of the Sacramento and Feather rivers for the flow and deposit of mining *debris;* and having so authorized their use, all the acts of defendants complained of are lawful, and the results of those acts, therefore, cannot be a nuisance, public or otherwise. It is not pretended that either congress or the legislature of California has anywhere in express terms provided that the navigable waters of the state may be so used, but this authority is sought to be inferred from the legislation of both bodies, recognizing mining as a proper and lawful employment, and encouraging this industry, knowing that mining of the kind complained of could only be carried on successfully by discharging the *debris* into the streams in the mining regions, which must, from the necessity of the case, find its way into the navigable waters of the state. As to congress, it might be sufficient to say that it has no authority whatever to say what shall or what shall not constitute a nuisance within a state, except so far as it affects the public navigable waters, and interferes with interstate or foreign commerce, or obstructs the carrying of the mails. Under its authority to regulate commerce between the states, and establish post-roads, congress may

doubtless declare and punish as such the obstruction of the navigable waters of the state, as a nuisance to interstate and foreign commerce, but there its authority ends. The necessary results of the acts complained of clearly constitute a public and private nuisance, both at common law and within the express language of the Civil Code of California, already cited; and there is no limitation upon that definition, except that contained in section 3482 of the same Code, which provides that "nothing which is done or maintained under the *express* authority of *a statute* can be deemed a nuisance." That means, of course, a statute, and a *valid* statute of the state. The case in hand is not within this limitation, because there is no statute of the state *expressly* authorizing the defendants to send their *debris* down, to the destruction or injury of the navigable waters of the state, or to the destruction or injury of the property of the riparian proprietors along the line of the water-courses of the state, navigable or otherwise; and if there were, the statute authorizing such injuries as are complained of, as against private parties at least, would be unconstitutional and void.

It is only sought to work out this authority by implication and inference from statutes recognizing mining in itself, without reference to injuries to the property of others, as a legitimate and proper business. It is not the general practice of legislative bodies in this country, where their powers are limited, in legislating upon various subjects within their province, to provide that in the exercise of rights provided for, no injury shall be done to the property of others. It is one of the conditions always implied by the law, that one's rights, whether granted or regulated by the legislature, shall be exercised with due regard to the rights of others—so exercised as not to injure and ; and certainly no authority to encroach upon the vested rights of others can be inferred without being in express terms clearly authorized; and this principle is expressly recognized in the statutory limitation on the definition of a nuisance cited. This *express* provision excludes the idea that the legislature contemplated any other limitation than such as is authorized in *"express"* terms. It is as potent in the form expressed, as if the statute had said, in express terms, that there should be no other limitation. But no intention can be properly inferred, from any act of congress brought to our notice, to permit the destruction or injury of the navigable waters of the state, or the destruction or injury of the towns and cities, or property of the riparian and adjacent owners along the water-courses of the state, navigable or otherwise. As to non-navigable waters, congress had nothing to do with them, beyond the rights of the United States as a riparian proprietor, which are the same as the rights of other riparian proprietors, except that it might itself limit the rights of purchasers from the government of lands owned by it, sold subsequent to the passage of the act under which such limited sales are made. It had no power whatever to enlarge the rights of the vendees of the United

States as against rights already vested in prior purchasers. It could in no way authorize any encroachment by the grantees of the United States upon, or injury to, the property of other private parties; and it will not be presumed that it intended any such consequences, where it has not manifested its intention in such express and explicit terms that it can not be misunderstood.

Upon the cession of California by Mexico, the sovereignty and the proprietorship of all the lands within its borders, in which no private interest had vested, passed to the United States. Upon the admission of California into the Union, upon an equal footing with the original states, the sovereignty for all internal municipal purposes, and for all purposes except such purposes and with such powers as are expressly conferred upon the national government by the constitution of the United States, passed to the state of California. Thenceforth, the only interest of the United States in the public lands was that of a proprietor, like that of any other proprietor, except that the state, under the express terms upon which it was admitted, could pass no laws to interfere with their primary disposal, and they were not subject to taxation. In all other respects the United States stood upon the same footing as private owners of land. They could authorize no invasion of private property, either to enable their grantees to mine the lands purchased by them of the government, or otherwise. *Biddle Boggs* v. *Merced Min. Co.* 14 Cal. 375, 376; *People* v. *Shearer*, 30 Cal. 658; *Pollard's Lessee* v. *Hagan*, 3 How. 223. The observations of Chief Justice FIELD in the first case cited, on pages 375, 376, are as applicable to this point as to that under discussion in that case. As owners of the public lands, the United States, like any other owner, could sell them in large or small quantities, and convey a fee-simple title to their grantees; or could lease them, or reserve them from sale; or grant a limited estate, subject to easements granted to others; or in case of mines, might allow them to be worked free of charge, or upon payment of a royalty. They could do all this with their own lands, held in the character of proprietor merely, as the public lands are held; but they could not grant lands, and in the grant, or by statute or otherwise, impose an easement for the benefit of their grantees upon lands already owned in fee by private parties, unincumbered by easements or conditions of any kind; or authorize any other trespass upon or injury to such other lands. They could only deal with their own, as other land proprietors deal with theirs. Being the owners of the mineral as well as the agricultural lands of the state not already become private property by prior grants, all the legislation of congress upon the subject has had reference to all those lands as their property in the character of property, and to their sale or other disposition. The agricultural lands the United States had theretofore sold absolutely, conveying a fee-simple title, without easements, incumbrances, or reservations of any kind. Had it been the policy of the United States to sell these min-

eral lands in a similar mode, according to the usual surveys and legal subdivisions in the case of other public lands, I apprehend that no one would have contended that by authorizing the sale and convey- ance of such lands in fee-simple, *the government* intended to give to its grantees authority to fill up the navigable waters of the state or its non-navigable water channels, and when these were filled, to send their *debris* over the neighboring country, to the destruction of the farms and improvements of their owners, on the ground that congress knew, when it authorized the sale, that the grantees of the United States could not make the lands so purchased available for *all* the uses for which they were valuable, and in many instances for which they are *only valuable*—such as mining for gold—without committing such nuisances. Yet, when the United States convey their lands in fee-simple, they invest their grantees with all the rights they are capable of conferring. Now, the legislation of congress, instead of enlarging or attempting to enlarge the rights of the grantees of the United States in the mineral lands beyond the rights which the gov- ernment possesses, has put limitations, restrictions, and incumbrances upon these grants, in many instances granting to one party one estate, and to another a separate estate, in the same lands, all the estates, granted to the several grantees of different interests in the same lands, in the aggregate, making up the fee, and no more; and it is to this end, and to this end alone, that the legislation of congress has been directed with reference to the mineral lands. Undoubtedly, it was the purpose of these restrictions upon grants of the mineral lands to encourage mining which, in itself, when pursued without injury to others, is a lawful pursuit, as are agriculture, manufactures, and commerce.

Until 1866 there had been no legislation by congress in regard to lands containing the precious metals, other than to reserve them from sale. In July of that year congress passed the "act granting the right of way to ditch and canal owners over the *public lands,* and for other purposes." That act declared that the mineral lands are "to be and are open to exploration and occupation by all citizens of the United States,  \*   \*   \*   subject to such regulations as may be pre- scribed by law, and subject, also, to the local customs or rules of miners in the several mining districts, so far as the same may not be in conflict with the laws of the United States." It also provided for a sale and patenting to miners of *quartz* lodes in limited quanti- ties, with a right to follow the vein down on its dip to any depth, although it should extend under other lands, without the boundaries of the surface lines of the patent. So, also, it recognized the equi- ties, as against the United States and other miners, of those who had acquired water-rights for mining, agricultural, manufacturing, and other purposes recognized by the "local customs and decisions of courts," and provided that they should be maintained in these rights, and granting a right of way over the *public* lands; but it took care to

provide that where any party, after the passage of the act, should "injure or damage the *possession* of any settler on the *public domain*, [no matter for what purpose he has settled,] the party committing such injury or damage shall be liable to the party injured for such injury or damage." 14 St. 251–253. This act but legalized what were before trespasses upon the public lands, and made lawful, as between the occupants and the United States, that which before was unlawful. It only provided for the sale of quartz mines and granting water-rights on the public lands, although all kinds of mines were open to exploration and working.

In this case the United States were absolute owners of the lands, and they might have granted an absolute right of way for ditches and canals, without providing for compensation for injuries to occupants; but so careful was congress not to injure others, even where it lawfully might, that it provided that a party constructing a ditch or canal should be liable for any injury or damage done to any *mere possessor of the public lands.* If congress was so careful to provide against authorizing any injury to the mere possessors of the public lands, where it might lawfully do otherwise, it cannot be reasonably supposed or inferred that it intended by the same act to authorize, by inference merely, the commission of a great and intolerable nuisance, and the perpetration of aggravated injuries to large communities holding their own lands independent of the United States, and by the same title, and under the same treaty as those under which the government itself claimed—injuries to the lands over which the United States had no municipal or proprietary or legislative authority whatever. But one section of the act of 1866, now constituting section 2338 of the Revised Statutes, is especially relied on as unmistakably showing an intent on the part of congress to authorize the filling up of the navigable rivers of the state. It reads as follows:

"*As a condition of sale,* in the absence of necessary legislation by congress, the local legislature of any state or territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development; *and those conditions shall be fully expressed in the patent.*"

We draw an entirely different inference from this provision from that sought to be deduced by defendants' counsel. To our minds it seems perfectly clear that this provision is limited to a surrender of this right to the state, *so far, and so far only,* as the *public* lands are concerned. It authorized the states and territories, in the "*absence of specific congressional legislation*" on the subject, to make rules imposing easements and drainage, and other rights necessary to the complete development of the mines upon the lands of the United States; and subsequent purchasers from the government would take the lands purchased subject to these incumbrances, "*as a condition of sale;*" "*and those conditions shall be fully expressed in the patent.*" "Condition of sale" of what lands, and "fully expressed" in what pa-

tent? The United States could prescribe conditions of sale for no lands but their own, and could require those conditions to be inserted in no patent but their own. It is clear from the express terms of the statute that this section could have no possible reference to anything but the lands of the United States. It deals with them alone, and was only intended to give rights in the public lands of the United States. As to other lands, or property, either of the state or private parties, or as to any private rights of any kind, congress, by no possible legislation, could add anything to the legislative powers of the state upon the points mentioned in this provision of the statute; and it was never guilty of so absurd an act as to attempt it. Of course, as counsel very properly observes, this section "must be construed with reference to the subject-matter to which it refers," but that subject-matter is the *disposition of the public lands and the mines contained in them, and nothing more*. It had no relation to regulating commerce on the navigable waters of the state. The state, under the express terms of the act of admission, could not in any way interfere with the disposition of the public lands; and congress, under its constitutional power "to dispose of, and make all needful rules and regulations respecting the territory and other property belonging to the United States," was authorized to impose this condition on the state. Such legislation as is here authorized, "in the absence of necessary legislation by congress," would be a direct interference with the proprietary right of the government, and "with the disposition of the public lands." The object, therefore, was to waive this right of the United States, under the circumstances, and in the particulars provided for, and that is all that can be inferred from the provision. The thing intended to be authorized was expressed in clear language, and not left to inference.

Subseqently, in 1870 and 1872, congress passed further acts regulating the disposition of mining lands, and extending the sale to placer mines, imposing on lands sold, under prescribed circumstances, and upon prescribed conditions, easements of various kinds, such as tunnel rights, water rights, rights to follow lodes on their dips under lands sold to others, etc. But there is no provision more strongly indicating a purpose to authorize the injuries complained of than those in the act of 1866, already disposed of, and they need not be more particularly considered.

Had all these lands on the water-shed of the Yuba, or all lands in the state containing mines, been owned under a Spanish grant by a private party, as was the Merced grant, confirmed to Fremont, the owner of the lands might have made precisely such regulations as to the sale or working of the mines, and giving water rights and other easements in his lands as the United States have done by their legislation, and with precisely the same effect. Had such been the case, would counsel for a moment have pretended that by such regulations he intended to subordinate the navigable waters of the state, and the

rights of all property holders on the waters of the state below, to the uses of his grantees of mines? Yet the inference that he did so intend would be just as legitimate as the inference that congress so intended by the legislation relied on; and if he so intended, he had just as much power to give effect to his intention as had congress.

Because in the river and harbor bill of 1880 there was a provision directing the secretary of war to cause such examinations and surveys to be made "as may be necessary to devise a system of works to prevent the further injury to the navigable waters of California from the *debris* from the mines, and estimates of the cost of such works, and report the result of such examination, surveys, and estimates of costs," etc., to congress, at its next session; and because, in pursuance of the examination, surveys, estimates of cost, and reports, congress, in 1882, appropriated $250,000 for the "improvement and protection of the navigable channels of the Sacramento and Feather rivers," it is urged that congress assumed the responsibility of protecting the navigable rivers of California from any injuries to navigation occasioned by mining *debris*, and that by such legislation and assumption of responsibility, congress had legalized the use of the navigable waters of the state for the flow and deposit of such mining *debris*. We do not think that any such authority to injure or destroy the navigable waters of the state can be inferred from these acts. If congress had the power to grant it, there is no affirmative authority given to use the navigable waters of the state for the flow and deposit of mining *debris*. This action of congress recognizes and admits the fact that great injury has resulted, and continues to result, from the use of the waters for such purposes; that the injury is of such a character as not only affects the rights of the people of California, but of the whole United States, to such an extent as to make it a proper subject for congress to provide a remedy for the evil. *There could possibly be no better evidence that a great public nuisance has been committed,* which calls for redress, and congress has attempted to furnish a remedy. It has attempted a remedy that may or may not be effective, or that may or may not be the best that might be adopted.

In the same act provisions of a similar character are found for surveys, estimates, plans, reports, etc., for numerous other obstructions to navigation in the rivers, harbors, lakes, etc., in other parts of the United States, where there is no mining *debris*; and in the very act making the appropriation referred to there are more than 350 other items of appropriation for removing all sorts of obstructions, and for improving navigation, in a great variety of particulars, in every part of the United States. But no argument can be drawn from these provisions and appropriations that congress authorized these obstructions, or assumed the original responsibility of their being there. Congress simply found them there, recognized the fact of their existence, and the necessity for their removal, and, under its

power to regulate commerce, endeavored to remove them, and thereby improve the navigation. Nothing more was done in this case, and no other inference can be drawn from its action in regard to it than that which flows from precisely similar action in the large number of the other cases provided for. They are all covered by the same act, and in like terms. There is nothing in the act to distinguish this appropriation from the hundreds of others. If congress has the power by legislative action to prohibit the discharge of *debris* into the navigable rivers of the state, and make it a crime against the United States, as it undoubtedly has, it has simply not done it, and it has not taken any affirmative action to authorize it. Mere failure to act—failure to prohibit the acts complained of—is an entirely different thing from affirmative action authorizing them. And a failure to prohibit the nuisance and impose penalties does not prevent its being a public nuisance. *Wheeling Bridge Case*, 13 How. 566, 567. It has merely endeavored to remedy the acknowledged evils—the necessarily admitted public nuisance—by other means, which may turn out to be far less effective. If the acts under the express laws of the state constitute a nuisance, there is no need for congress to declare them so to make them unlawful; and it would certainly require some affirmative legislation on the part of congress to make that lawful which the laws of the state declare to be unlawful, conceding the power of congress to so enact.

But if congress had attempted to authorize an unlimited discharge of mining *debris* into the navigable waters of the state, to the destruction of or great injury to their navigability, it had not the power to render it lawful. In *Pollard's Lessee* v. *Hagan*, 3 How. 223, the supreme court of the United States says:

"When Alabama was admitted into the Union on an equal footing with the original states, she succeeded to all the rights of sovereignity, jurisdiction, and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession, and the legislative acts connected with it. Nothing remained to the United States, according to the terms of the agreement, but the public lands. And if an express stipulation had been inserted in the agreement granting the municipal right of sovereignity and eminent domain to the United States, *such stipulation would have been void and inoperative, because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignity, or eminent domain within the limits of a state, or elsewhere, except in the cases in which it is expressly granted.*"

Again:

"If it were true that the United States acquired the whole of Alabama from Spain, no such consequences would result as those contended for. It cannot be admitted that the king of Spain could, by treaty or otherwise, impart to the United States any of its royal prerogatives; and *much less can it be admitted that they have capacity to receive or power to exercise them.* * * * In the case of *Martin* v. *Waddell*, 16 Pet. 410, the present chief justice, in delivering the opinion of the court, said: 'When the revolu-

tion took place the people of each state became themselves sovereign, and in that character hold *the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution.* Then, *to Alabama belong the navigable waters, and soils under them,* in controversy in this case, subject to the rights surrendered by the constitution to the United States; and *no compact that might be made between her and the United States could diminish or enlarge these rights.*"

The court then recognize the authority of the United States to exercise such powers, and such powers only, as may be necessary, under the national constitution, "to regulate commerce with foreign nations, and among the several states, and to establish post-roads." The court then says:

"This right of eminent domain over the shores and the soils under the navigable waters, for all municipal purposes, belongs *exclusively* to the states within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers."

It then states its conclusions upon the points discussed, as follows:

"*First,* the shores of navigable waters, and the soils under them, were not granted by the constitution to the United States, but were reserved to the states respectively; *secondly,* the new states have the same rights, sovereignty, and jurisdiction over this subject as the original states; *thirdly,* the *right of the United States to the public lands, and the power of congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy in this case.*"

This case has never been overruled, but often cited as authority and affirmed. If "the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain within the limits of a state," except so far as is "expressly granted;" if the "navigable waters" of California "and the soil under them" belong to the state for its "common use," subject only to the right of congress to regulate commerce among the states thereon; and if no compact that might be made between her and the United States could diminish or enlarge these rights; if "the right of the United States to the public lands, and the power of congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant" the soil under the navigable waters of the state, then it necessarily follows that congress can give no lawful authority to the miners on its public lands, or to anybody else, to fill up the channels and beds of such navigable waters, and destroy them for navigation, or for any other useful purpose. Congress is authorized to "*regulate,*" but not to *destroy* "commerce among the states." It may, undoubtedly, in its wisdom, obstruct, or, perhaps, destroy navigation, to a limited extent, at particular points, for the purpose of

its general advantage and improvement on a larger general scale, such, for example, as by authorizing the building of a railroad or post-road bridge across a navigable stream; but it cannot destroy, or authorize the destruction, entire or partial, of the whole system of navigable waters of a state for purposes wholly foreign to commerce or post-roads, or to their regulation. If congress could so authorize, or, as is claimed, has so authorized, the acts complained of as to make them lawful, then it can authorize, and it has authorized, the filling up and utter destruction of all the navigable rivers, streams, and bays of the state, for there is no limit fixed to the amount of *debris* that may be sent down; and upon the hypothesis claimed, if such waters are not filled up and destroyed, it is for want of physical capacity to do it, and not because it is unlawful.

But the injury to navigation is not the only element of a public nuisance in the case. The injuries already accomplished, and those still accruing, as well as those threatened to the cities and riparian proprietors of a large extent of country, if unlawful, constitute a public nuisance of themselves, irrespective of the injuries to navigation; and there can be no possible ground for maintaining that congress has authority to legalize such injuries, and take away their character of a public nuisance. There is, then, no plausible ground for holding that congress has ever attempted to make the acts complained of lawful, or, if it had, that there is any power vested in congress to effect that purpose. Those acts, therefore, have not been legalized by reason of any congressional action.

But if wrong with respect to the effect of the action of congress, defendants earnestly urge that their acts are authorized by the legislation of the state of California, and are, therefore, lawful; and it will be necessary to consider this point. We have before given the statutory definition of a nuisance, and expressed the opinion that it is not open to doubt or discussion that the flowing of the mining *debris* in question down the Yuba into the Feather and other waters, and its deposit in the manner before stated, causes both an obstruction to "the free passage or use in the customary manner" of the rivers, bays, and navigable streams of the state, and also "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of both life and property."

It is not claimed that any statute of the state, in express terms, authorizes miners to fill up the channels of the waters of the state with *debris* to such an extent as to injure navigation, or to bury and destroy the lands of riparian proprietors. This right is only inferred from legislation recognizing and encouraging mining as in itself a lawful pursuit. As we have seen, to take away the character of nuisance from the acts complained of, they must have been done under the *express* authority of a statute, (Civil Code, § 3482,) and it must be a valid statute. No authority to commit the nuisances complained of can be inferred from any statute of the state brought to our notice.

The section of the statute which seems to be most relied on is subdivision 5, § 1238, of the Code of Civil Procedure, which provides that—

"Subject to the provisions of this title, the right of eminent domain may be exercised in behalf of the following public uses: * * *

"5. Roads, tunnels, ditches, flumes, pipes, and dumping places for working mines; also outlets, natural or otherwise, for the flow, deposit, or conduct of tailings or refuse matter from mines; also an occupancy in common by the owners or possessors of different mines of any place for the flow, deposit, or conduct of tailings or refuse matter from their several mines."

This is stated by counsel to have been passed in compliance with the provision in the act of congress of 1866, now section 2338 of the Revised Statutes of the United States, already considered, authorizing the states and territories, "in absence of specific legislation by congress," to provide for certain easements on the public lands, and it was doubtless suggested by that act.

The state supreme court, in one case, held that mining is not a public use, in favor of which this right of eminent domain can be constitutionally exercised in the case of a private party. An elaborate argument has been made in favor of the constitutionality of the act, but we do not find it necessary to decide it; for the statute, whether constitutional or otherwise, does not authorize the use of the navigable waters of the state to the injury of navigation, or the discharge by miners of their *debris* upon the lands of riparian proprietors, without condemnation and payment, in the mode pointed out by the statute. Instead of inferentially authorizing the injuries complained of, the inference is directly the other way—that there is no authority to do an act which would work an injury to a public or private right, or, in other words, constitute a public or private nuisance, without first acquiring the right to use the property to be appropriated or injured, by purchase or condemnation of and payment for the property or right appropriated. It recognizes the constitutional right of every man to the undisturbed enjoyment of his property and all his legal rights, without let or hindrance, until his right has in some lawful mode been extinguished. Besides; it is by no means certain that the statute itself would authorize the condemnation of the property in gross of large communities like those affected by the nuisance complained of, and especially the public right of navigation common to the people of all the states. The other provision of the statute most confidently relied on to show that the injuries complained of are lawful, is subdivision 8, in section 1, of the act of 1878, "to provide a system of irrigation, promote rapid drainage, and improve the navigation of the Sacramento and San Joaquin rivers," which reads as follows:

"The state engineer shall also inquire into the relation which hydraulic mining bears to the navigation of the rivers, and to their carrying capacity; to inquire into the question of the flow of *debris* from the mines into the water-courses of the state; to ascertain the amount and value of agricultural lands and improvements which have been *covered up or injured*, by the over-

flow, or deposit of *debris* coming from the hydraulic and other mines in the Sacramento valley; and to devise a plan whereby the *injuries caused thereby* can be *averted,* without interfering with the working of such mines."

This, like the action of congress before considered, does not purport to authorize the acts complained of, or recognize in any way their legality. It recognizes the results of the action of defendants, and others engaged in the same business, as constituting *injuries,* so serious in their character as to require the state to afford some remedy in addition to the civil remedies afforded by the law; and it sought to devise a plan whereby these injuries might *"be averted* without interfering with working the mines." It nowhere said that these acts were lawful, but it expressly calls them by the proper legal name, *"injuries,"* which, *ex vi termini,* imports that they are unlawful, or otherwise they would only be *damnum absque injuria.* An injury is "a wrong or tort." Bouv. Law Dict. It nowhere provides or intimates that any plan devised should take away, or be a substitute for, the civil remedies already provided by the Code in section 3491, as follows: "The remedies against a public nuisance are: (1) indictment or information; (2) a civil action; (3) abatement."

Sec. 3493: "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise."

To repeal or limit the express provisions of the Code defining nuisances, and providing remedies for them, requires something more than an effort to "avert" the injuries by *additional* means. There must be *"express* authority of a statute," and a valid one, to take away the character of a nuisance from the acts which would otherwise necessarily be a nuisance in fact and in law. We find no such express authority, and none can reasonably be inferred or implied from any statute of the state, or from all the statutes brought to our notice taken together. The effort of the legislature in these statutes was to "avert," not to render lawful, these nuisances—to prevent the acts in question from producing a nuisance. These statutes concerning nuisances, under the constitution, cannot thus be repealed by implication by other laws having no reference to the subject. Every law passed under the limitations imposed on the legislature by the state constitution must relate to a single subject, which must be expressed in its title.

Undoubtedly, mining is an important industry in the state of California, and the state may, very properly, take any lawful measures within its power to encourage it, to the full extent, that it can be carried on without injury to or the destruction of other industries or other rights, also important. It became patent to the most casual observer that some plan must be devised by which hydraulic mining could be carried on without injury to the agricultural regions in the valleys, and without obstructing or destroying the use of the navigable waters of the state, or, in other words, without creating a grievous nuisance in the valleys below, or else that such mining must be

stopped. There was no other alternative. It was therefore important to the interests of the state, if possible, to adopt the first alternative, and the legislation referred to was simply designed to authorize the devising and carrying out of some plan by means of which the business of mining could be successfully pursued without creating or further continuing these nuisances. Its manifest purpose was to "avert" or obviate, *not to authorize,* the nuisance—to devise and carry out a plan by which no nuisance would be created, so that all branches of industry might be harmoniously carried on together without injury to each other. This was a perfectly natural and legitimate object, and not at all inconsistent or incompatible with the idea that if, notwithstanding these efforts, mining should still continue to be carried on in such a way as to create or continue a nuisance, the statutes relating to nuisances and the remedies provided should still be applicable. This legislation is entirely consistent with the continuance of the laws and remedies relating to nuisances; and those laws cannot be regarded as repealed, superseded, modified, or limited by it.

Numerous cases have been cited from the English chancery reports, largely in relation to the sewage of large cities, towns, or other organizations having the matter in charge, where these bodies have been authorized by acts of parliament to construct sewers and discharge their sewage into the streams, which when constructed created nuisances to lands below; and in all such cases it has been held that they took nothing by implication, but must be limited to the acts clearly authorized; and that if they could not accomplish the desired object by the acts expressly authorized without creating a nuisance, they would be restrained. Although parliament, being omnipotent in its legislative capacity, could authorize nuisances, or the taking of or injury to private property without compensation, it was always cautious not to do so, and the courts were still more careful not to imply or infer authority to create nuisances not clearly given in terms by the act. The following are some of the cases referred to: *Atty. Gen.* v. *Colney Hatch Lunatic Asylum,* L. R. 4 Ch. App. Cas. 153; *Clowes* v. *Staffordshire Potteries Water-works Co.* L. R. 8 Ch. App. Cas. 125; *Atty. Gen.* v. *Birmingham,* 4 Kay & J. 528; *Atty. Gen.* v. *Leeds Corp.* L. R. 5 Ch. 583. But if we are mistaken as to the purpose and effect of the state legislation, considered and relied on by defendants, the state had no constitutional power to authorize the acts complained of, and any statute designed to effect that object is void.

The old constitution of California provided that "no person shall * * * be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use without just compensation." Article 1, § 8. And the fourteenth amendment to the constitution of the United States puts a similar limitation upon the powers of the states. Sections 13 and 14 of article 1 of the new constitution of California, 1879, continues these provisions—the latter inhibition being in the following language: "Private property shall

not be taken *or damaged* for public use *without just compensation having been first made to or paid into court for the owner,"* etc.    And article 12, § 8, provides that "the exercise of the police powers of the state shall never be *so abridged or construed as to permit corporations to conduct their business in such a manner as to infringe the rights of individuals or the general well-being of the state."*

The defendants allege in their answers that they have taken and held adverse possession, for the purpose of discharging and depositing their *debris,* in common with all the other miners upon the rivers above, of 125 acres of complainant's land, until they have acquired a title by adverse possession; and the evidence shows that 25 square miles or more of other private lands are in the same condition, and that, but for the levees built by the citizens of the city of Marysville, and the citizens of Yuba and Sutter counties, and the one built by the miners themselves, the whole surrounding country, for an indefinite distance, would necessarily have been, and that by future floods, breakage in the levees, and additional accumulation of these deposits they are hereafter liable to be, placed, to a greater or less extent, in a similar condition. It is not pretended that there has been any compensation paid, or that the owners of these lands have been deprived of them or of their use, or that they have been thus appropriated by the defendants for their own use by virtue of any legal proceedings of any kind, or by virtue of any authority other than their own will and pleasure, and the license claimed to have been impliedly given them by the legislation of congress, and of the state legislature, already considered. Now, is not this a depriving the owners of their lands— their property—or at least damaging their property, both without due process of law and without compensation ? If so, then the legislation of the state of California, if any there be, intended and purported to make the acts complained of valid, are absolutely void, as being in direct contravention of both the constitutions of the United States and the state of California; and they cannot make the acts of defendants lawful, or in any way affect the rights of the complainant.

That such acts of appropriation violate these provisions, is settled by the supreme court of the United States in *Pumpelly* v. *Green Bay Co.* 13 Wall. 181. This case arose out of the flooding of complainant's land, by means of a dam constructed for the purpose of improving the navigation of Fox river,—manifestly a lawful public use, clearly within the power as well as the duty of the state, if performed in a lawful manner,—under the authority of a statute of Wisconsin, the constitution of which state contained a provision similar to that of one of the provisions now under consideration. After a full discussion of the question, and examination of authorities relied on to sustain the validity of the act, Mr. Justice MILLER, speaking for the court, says :

"But we are of opinion that the decisions referred to have gone to the uttermost limit of sound judicial construction in favor of this principle, and,

in some cases beyond it, and that it remains true, that, where real estate is actually invaded by superinduced additions *of water, earth, sand, or other material*, or by having any artificial structure placed on it, *so as to effectually destroy or impair its usefulness, it is a taking*, within the meaning of the constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle."

See, also, Cooley, Torts, 569, and cases cited. And, again, on page 182:

"We do not think it necessary to consume time in proving that when the United States *sells land by treaty, or otherwise, and parts with the fee by patent, without reservations, it retains no right to take that land for public use without just compensation, nor does it confer such a right on the state within which it lies; and that the absolute ownership and right of private property in such land is not varied by the fact that it borders on a navigable stream.*"

Such use, therefore, as defendants make, or claim to make, of complainant's land, is a taking, *a fortiori*, a *damaging* of the property of complainant within the meaning of the several constitutional provisions, state and national, cited. The case of *Eaton* v. *B. C. & M. R. R.* 51 N. H. 510, is also a very strong case to the same effect, in which the court reviews the authorities, and discusses the question with remarkable ability.

Conceding, then, that such use of these lands for deposit of mining *debris* is a public use, still the legislature, under this constitutional provision, could not make it lawful without taking them upon due process of law, and upon full compensation first paid. If the use is private, merely, as complainant confidently insists, not without reason, and with authority to support the position, then they could not be taken at all without the consent of the owner; for there is no authority in the constitution or laws of the country to compel one man, unwillingly, to surrender his property for the use of another, either with or without compensation. So, also, these defendants, or the principal ones, are corporations, and the business of these corporations is mining, and nothing more. They would, therefore, seem to fall within the inhibition of the provision that the "police powers of the state shall never be so abridged or construed as to permit *corporations to conduct their business in such manner as to infringe the rights of individuals or the general well-being of the state.*" Do not these defendant corporations so conduct their business of mining as to infringe the rights of the complainant, and a great many other individuals, and even the well-being of the state? And if their acts, in such conduct of their business, are attempted to be authorized by the legislation of the state, are not the "police powers of the state so abridged, or construed," by such legislation as to permit the inhibited acts? If so, it must be void on this ground also. It may be that this provision was aimed at infringements of rights of this very kind. If not, to what injuries can it be more appropriately applied?

Again, so far as any legislation is concerned that would attempt

to authorize the filling up of the navigable rivers and bays of the state, to the destruction or material injury of their navigation, it must be void for want of power on other grounds. We have seen that the title to the soil under the navigable waters of the state, immediately connected with the ocean, and within the ebb and flow of the tides, is in the state. *Pollard's Lessee* v. *Hagan, supra*. In the case of fresh-water rivers, however, above the ebb and flow of the tides, not in a proprietary sense: in such waters the proprietary right to the soil under the water is, ordinarily, in private parties, (*Jones* v. *Soulard*, 24 How. 65; *Smith* v. *City of Rochester*, 92 N. Y. 463; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 185;) but whether in the state in a proprietary sense or not, the title is, nevertheless, in the state, in a governmental sense, as a part of its sovereign domain—a part of its municipal sovereignty—held in trust for all, to protect, preserve, and improve for the purposes of navigation, and the benefits of commerce, and not otherwise.

There are two senses in which the rights of the state are to be considered, one proprietary, and the other governmental: proprietary, as where the state owns an absolute fee in the land in the same manner and sense, with the same rights and powers, as an individual owns his land; and governmental, as where the title is held in trust for the use of the public, such as highways, navigable streams, etc. The former is alienable, *the latter inalienable*. If the state can be considered as holding a proprietary interest in the soil, under navigable fresh-water rivers, still, the alienation of such proprietary interest would, necessarily, be subject to the *inalienable* sovereign right of the state to control it for the proper public uses and trusts for which it is held in the interest of commerce, and of all the people. *Smith* v. *City of Rochester*, 92 N. Y. 477, 478. Says the court, by the chief justice, in that case, citing as authority *Martin* v. *Waddell*, 16 Pet. 367: "While a sovereign may convey its proprietary rights, *it cannot alienate its control over navigable waters without* abdicating its sovereignty." Id. 484. Again, quoting Judge EARL in *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, the court says: "The legislature, except under the power of eminent domain, upon making compensation, can interfere with such streams only for the purpose of *regulating, preserving, and protecting the public easement. Further than this, it has no more power over fresh-water streams than over private property.*" Id. 485. If the legislature cannot interfere with such streams for purposes other than those mentioned, it certainly cannot authorize them to be filled up with *debris* from mines, or otherwise, to the destruction of the public easement—the right of navigation. The title in such cases, especially to navigable waters extending to the ocean, is held, not merely for the benefit of citizens of the state, but also for the uses of interstate and even foreign commerce, and the benefit of the people of all the states interested in commerce among the several states,

**v.18,no.14—50**

and with foreign nations. Such is the doctrine established by the authorities.

The admission of California into the Union was "upon the express condition," provided in the act for admission, that "all the navigable waters within the said state shall be common highways, and forever free as well to the inhabitants of said state *as to the citizens of the United States,* without any tax, impost, or duty therefor." 9 St. 452, 453. In the *Wheeling Bridge Case,* commenting upon a similar provision in the compact between Virginia and Kentucky, afterwards sanctioned by congress, the supreme court says:

"And they expressly sanctioned the compact made by Virginia with Kentucky at the time of its admission into the Union, 'that the use and navigation of the river Ohio, so far as the territory of the proposed state or the territory that shall remain within the commonwealth lies thereon, shall be free and common to the citizens of the United States.' *Now an obstructed navigation cannot be said to be free.* * * * This compact, by the sanction of congress, has *become a law of the Union.* * * * *No state law can hinder or obstruct the free use of a license granted under an act of congress* [a license to a vessel to navigate the waters of the United States.] Nor can any state violate the compact, *sanctioned as it has been,* by obstructing the navigation of the river." 13 How. 565, 566.

The provision in the act of admission may not be valid as *a mere compact* between the United States and the new state, but it is valid as an act of congress passed by virtue of its constitutional power to regulate commerce among the states and with foreign nations, and its authority to establish post-roads. *Pollard's Lessee v. Hagan,* 3 How. 224, 225, 229, 230. In the *Wheeling Bridge Case,* as we have seen, the court says: "The compact, by the sanction of congress, *has become a law* of the Union." 13 How. 566.

The conditions thus imposed upon California by the act of congress admitting her into the Union cannot be lawfully violated by obstructing, much less destroying, the navigation of her rivers and bays for purposes having no relation to facilitating navigation or commerce. The power of congress to regulate commerce between the states would also, doubtless, enable it, by proper legislation, independent of these conditions imposed by the act of admission, to prevent the state from destroying or obstructing, or authorizing the destruction or obstruction of, the capacity for navigation of her navigable waters. If California can lawfully authorize, and if she has authorized, the acts complained of, as is argued by defendants, then, as was said in regard to the United States, the whole navigable waters of the rivers and bays of the state may be filled up, and their navigability be utterly destroyed; and if they are not so filled, it will be because of a want of physical capacity, and not because it is unlawful to do it. But we are satisfied that neither congress nor the legislature of California has attempted to legalize those acts, and that neither has the constitutional power to do it. Neither can one, by supplementing the acts of the other, effect this purpose. Both are without power to do it; and each with-

out power to add anything to the powers of the other. The acts complained of are therefore clearly unlawful; and the sending down and deposit of their *debris* in the rivers, navigable or otherwise, by the defendants, in the manner stated, to the injury of property-owners and the public, constitutes both a public and private nuisance, by which complainant has heretofore sustained, he is now sustaining, and he is hereafter likely, even morally certain, sooner or later to sustain, special injury.

Defendants next claim a right to do the acts complained of by prescription. Section 1007 of the Civil Code provides that "occupying for the period prescribed by the Code of Civil Procedure as sufficient to bar an action for the recovery of property, confers a title thereto, denominated a title by prescription, which is sufficient against all." It does not define what acts shall constitute such occupancy, or under what precise circumstances the title by prescription would arise, or, in other words, does not define the term "prescription." The statute really does nothing but fix the time at which a title by prescription shall vest, which was not very definite under the common law, but leaves the circumstances which constitute prescription to be determined by the settled law of the land as it stood before the Code. This is all the Code says, in terms, upon prescription. But at common law, no right could be acquired by prescription to commit, or continue, a *public* nuisance. In the words of Mr. Wood: "The law is that no length of time can prescribe for a public nuisance of any description." Wood, Nuis. 81, 30, 790–792. Or, as stated in Cooley, Torts, 613: "It is a familiar principle that no lapse of time can confer the right to maintain a nuisance as against the state." The authorities to this effect are numerous and uniform. But even if it were not so, the express provisions of section 3490 of our Civil Code, "No lapse of time can legalize a public nuisance amounting to an actual obstruction of public right," establishes the same rule, so that it is not open to question in this state. In this connection, after stating that a right can be acquired by prescription when a nuisance is *purely private*, and concerns *only* the one person, or the few who are injured, Judge Cooley observes: "There still remains the case of a public nuisance not complained of by the state, but by those to whom it works a peculiar injury; and whether the right to maintain it, as against such persons, can be gained by lapse of time, *may possibly* be open to some question;" but after considering the point, he announces his conclusions as follows: "On the whole, the better doctrine would seem to be that the acquisition of rights by prescription can have nothing to do with the case of public nuisances, either where the state or where individuals complain of them," citing a large number of cases wherein the doctrine is recognized and stated, if the point was not necessarily involved or decided. Id. 613, 614.

And "a uniform *consensus* of such judicial expressions of opinion," even though not absolutely necessary to the decision of the case,

"especially where accepted by able and approved text-writers, and not contradicted by a single direct decision, is as high evidence of a doctrine or rule of law as can be found." *Santa Clara Co.* v. *Southern Pac. R. Co.* 18 FED. REP. 423, and 9 Sawy. ——. Wood also states this to be the rule, citing the authorities, pages 791, 792. In *Mills* v. *Hall,* 9 Wend. 315, SUTHERLAND, J., said: "Admitting that defendant's dam has been erected and maintained more than twenty years, and that during the whole of that period it has rendered the adjacent country unhealthy, such a length of time can be no defense to a proceeding on the part of the public to abate it *or to an action by any individual for the special injury which he may have suffered from it.* 8 Cow. 152, 153; 4 Wend. 9, 25." Among other cases, Wood cites *Reg.* v. *Brewster*, U. C. 8 C. B. 208, where a large tract of country and a public highway had been flooded and noxious gases issuing from it were producing disease. A prescriptive right to maintain the dam having been set up, the chief justice, in deciding the case, said: "It was urged at the trial that the dam had been erected for more than twenty years. For the purpose of establishing an easement affecting private rights of others this would be sufficient, generally speaking, but it is *not so when the consequences of this act are a public nuisance.*" And *Rhodes* v. *Whitehead,* 27 Tex. 304, in which it was held that no prescriptive right could be acquired to maintain a public nuisance, and if a private party should sustain special injury, by such public nuisance, it is a private nuisance also, and the party injured could maintain the action. "The reason is, that, being a public offense, it is unlawful in its inception and in its continuance, and being unlawful to the public in its aggregate capacity, it can never become lawful by any length of exercise against the individual members of the public." He then adds: "The doctrine of these cases, (the last two cases cited,) although reached without any very elaborate process of reasoning, and without any particular thought as to the result, nevertheless embodies the law as recognized in the courts of this country, and is supported by principle and authority." Wood, Nuis. 792.

We have no doubt that the rule thus stated is correct, and we so hold. In the case of a mere private nuisance of the kind in question, by continuing it under the proper conditions recognized by the law for the prescribed period, a right becomes vested by prescription, and, *thenceforth it is in itself lawful.* But in the case of a *public* nuisance, *it never becomes in itself lawful.* It is not *unlawful* as to the whole public, and *lawful* as to its constituents, or a part of its constituents. It is absolutely and wholly unlawful. The act being unlawful, a private party sustaining special damages from the nuisance—from the unlawful act—gains a *status* which enables him to maintain a private action for such injury. When a private person thus obtains a standing in court, by reason of his having suffered special damages, although he can only maintain his suit for an injunction on that ground, yet the court grants relief, not solely because the nuisance is private

so far as he is concerned, but because it is public, and the relief will benefit the public. Such appears to be the doctrine of the supreme court as declared in *M. & M. R. Co.* v. *Ward*, 2 Black, 492. Says the court:

> "A bill in equity to abate a public nuisance, *filed by one who has sustained special damages, has succeeded to the former mode in England of an information in chancery prosecuted on behalf of the crown* to abate or enjoin the nuisance as a preventive remedy. *The private party sues rather as a public prosecutor than on his own account;* and unless he shows that he has sustained, and is still sustaining, individual damage, he cannot be heard. He seeks redress of a continuing trespass and wrong against himself, *and acts in behalf of all others who are or may be injured.*"

The present case affords a striking illustration of the hardship and wrong that would result to private parties if any other rule should prevail. In the case of such a wide-spread public nuisance, where it is unlawful and cannot be prescribed against as to the injured public, why should any one private citizen—one of the constituents of that public—at the peril of losing his right by mere failure to sue, be compelled to take upon himself the burden and expense of a litigation which the public neglects to institute, and which would be as beneficial to the public as to himself, and as necessary to its well-being as to his own? "What is everybody's business is nobody's business," and time flies while one is waiting for another; or, in the language of Lord MANSFIELD, speaking upon the same point in a private action, *Folkes* v. *Chad*, 3 Doug. 340: "The length of time is not a bar. It is a public nuisance which may increase every hour, and it is *nobody's business to prosecute.*" See, also, *Hatch* v. *W. I. B. Co.* 7 Sawy. 147; [6 FED. REP. 326, 780.] In this particular case, a single individual, no matter how great his injury, might well shrink, and would be very likely to shrink, alone and unaided, from undertaking so Herculean a task as is required for the vindication of his rights; and, in fact, all of the thousands interested did shrink from the burden until an organized combination of private citizens, suffering special damages and fearing greater, residing in several counties, came to the support of individual members of their number, of whom complainant is one, and a representative one. We think, and so hold, that no right by prescription, either as against the public, or complainant as one of the public, has been, or could be, vested in defendants that can defeat this suit.

If wrong upon the last point discussed, and a valid prescription may arise so as to cut off the right of action of a private party receiving special damage from a public nuisance, or considering the nuisance complained of as private merely, we think that no valid prescriptive right, as against the complainant, is satisfactorily shown to have attached. According to Greenleaf: "In order that the enjoyment of an easement in another's land may be conclusive of the right, it must have been adverse; that is, under *claim of title with knowl-*

*edge and acquiescence of the owners of the land,* and uninterrupted; and the *burden of proving this is on the party claiming the easement.* If he leaves it doubtful whether the enjoyment was *adverse, known to the owner, and uninterrupted,* it is not conclusive in his favor." 2 Greenl. Ev. § 594. The enjoyment must be not only adverse, but continuous, and without increase or change to the greater injury of the owner, for the entire period, to vest the right; and "knowledge" means, not only knowledge on the part of the owner of the act of occupation and enjoyment, and of the party occupying and enjoying, but also *knowledge that the party in fact claims the right of enjoyment adversely to him* of the estate thus claimed in the property. "There must have been such a use of the premises, and such damages, as will raise the presumption that the plaintiff would not have submitted to it unless the defendants had acquired a right so to use it." *Grigsby* v. *Clear Lake Water Co.* 40 Cal. 406.

The definition of acquiescence, applicable to prescription, given by one of complainant's counsel, who has examined and analyzed the authorities with very great elaboration and ability, we think correct, and is as follows:

"Acquiescence is conduct recognizing the existence of a transaction, and intended, in some extent at least, to carry the transaction, or permit it to be carried, into effect. Acquiescence must necessarily exist while the transaction is going on from which a right of action would otherwise arise, and its operation necessarily is to prevent a right of action from thus arising, and not to defeat the right after it has arisen. Mere delay, therefore,—mere suffering time to elapse,—without doing anything, is not acquiescence, although it may be evidence, and sometimes strong evidence, of acquiescence."

This definition is substantially that found in 2 Pom. Eq. Jur. § 965, as derived from the authorities there cited.

The value and probative force of *mere* delay—the suffering of time to elapse without bringing suit—as evidence to establish the fact of acquiescence, depends largely upon the circumstances and condition of things in view of which the delay occurs. For example: In the ordinary case of the flowing of a party's land by an adjoining or neighboring proprietor, where the parties are in daily and frequent personal intercourse, the quiet submission to the wrongful flooding for the period prescribed, without objection or remonstrance, where the wrong and the wrong-doer are necessarily well known to the party injured, and where a personal remonstrance must naturally be expected, would furnish very persuasive evidence of acquiescence. But under other circumstances it might have very little probative force. In this case, the evidence indicates that in and prior to 1862, when the covering of the lands bordering on the Yuba first began, there were as many, at least, as 10,000 miners or more—defendants' witness, O'Brien, a witness well informed on the subject, says 30,000— at work on the Yuba and its tributaries, all discharging the *debris* resulting from their washing into these streams. And although hy-

draulic mining appliances were then of an inferior character, and the "Monitors" and "Little Giants" now in use had not developed their enormous excavating powers, the defendants claim that the greater number of miners at work upon the surface, where the material was lighter, more friable, and more easily dissolved and carried away, were nevertheless enabled to send a much larger amount into the streams than is possible now. The miners were then, and they now are, scattered over a region, and pursuing their mining vocations at various points, in a territory as large as the smaller of our states, at a distance of from 15 to 60 or 75 miles or more from the parties, or many of them, suffering injuries from their operations. The parties immediately suffering, past and present, and threatened with future injuries from the acts of defendants, are the inhabitants of four or five counties, engaged in mercantile, mechanical, manufacturing, and agricultural pursuits, at a great distance from the parties committing the nuisance, who reside in other counties. Long before the *debris* reaches the valley below, that coming from any particular mining operation becomes mingled in an indistinguishable mass with that coming from other mines independently and severally worked by other parties. No specific part of any injury can possibly be traced to any particular mine. The miners are generally nomadic in their habits,—at least they were until recently; and when this nuisance began they were coming and going from day to day,—an ever-changing body of trespassers.

In the first suit to restrain these nuisances which reached the supreme court of this state, and the only one in which the point has yet been decided by that court, it was held that parties working mines, severally, and independently of each other, but contributing to the nuisance, could not be joined as defendants, thus denying all practical legal remedy to parties injured by the nuisance. *Keyes v. Little York G. W. & W. Co.* 53 Cal. 724. Under such a ruling, certainly, delay in bringing a suit should have little force as evidence of acquiescence. A suit against a single trespasser would be utterly useless to protect one's rights against prescription. Is every property holder along the Yuba, Feather, and Sacramento rivers bound to ascertain, or can he be presumed to know, every miner in the mountains who is contributing to the nuisance by which he is injured or threatened, and presumed to know that he does it under an adverse claim of right? and if he fail to ascertain the trespassers, and commence a suit against them all, separately, within the period prescribed by the statute of limitations, is an acquiescence in the nuisance to be inferred as to every one not sued in such sense as to give effect to a prescriptive right? It would obviously be impossible to maintain one's rights under such a rule; and it would be preposterous to hold that such a rule exists. The law was never so unreasonable and absurd as to require such vigilance, or such efforts to preserve one's vested rights from the wrongful aggressions of a large number

of distant, individual, and concurrent, though not joint, trespassers, and especially if each must be sued separately, as must undoubtedly be the case in an action at law for trespass.  8 Sawy. 628; [S. C. 16 FED. REP. 25.]  The number of miners has gradually lessened, and the business, since the nuisance commenced, has finally been concentrated in fewer hands; but the difficulties suggested still exist.  There has been a change, not in principle, but only in degree. It is true that, technically speaking, this suit can only be maintained on account of the injuries already sustained and now being sustained by complainant himself, and those still threatened and imminent. But the case of this complainant is the case of every other property owner, individually, within the large territory affected, and the range of the effect and influence of the nuisance complained of.  If he cannot maintain this suit, then no other of these victims in common can.  Although technically the suit is only his, both in fact and in substance, it is not his alone.  It is a public suit, in which all who are injured are interested, and to the expense of which they contribute. It has been earnestly urged that the complainant pays but a small share of the expense; and that it is not his suit,—that he is a mere instrument for procuring jurisdiction.  The same may be said of any suit that any other party should bring, except, perhaps, as to the matter of jurisdiction, and as to that, it was the right of the parties to select a non-resident prosecutor if deemed more to their interest to do so.  The testimony shows that the expenses of this suit are paid by the *anti-debris* association, composed of the citizens of probably four or five counties affected by the nuisance; as Yuba, Sutter, Yolo, Sacramento, and doubtless part of Placer, the counties themselves also contributing; and that the expenses of the defense are paid by the "Miners' Association," composed of citizens of, and parties interested in, the several mining counties affected.

It is, therefore, disguise it as we will, or technically call it what we may, and there can be no disputing the fact, a suit between the mining counties and valley counties interested in the great questions presented for decision.  In view of the facts, is it not apparent that neither Woodruff nor any other one man, however large his property, could afford, unaided and alone, to enter into this litigation against the combined mining counties to redress his private grievances? Woodruff's interests involved are by no means insignificant, no matter how much may have been said to belittle them.  His block of stores, built on one of the most eligible business locations in Marysville, at a cost of at least somewhere between $40,000 and $60,000, his nearly 1,000 acres of farming land—among the best in the state— in Sutter county, called the Hock Farm, and his Eliza tract of over 700 acres on the opposite side of the river, in Yuba county, and upon which a little settlement, embracing business houses and a public regular steam-boat landing, once existed, of which 125 acres in the aggregate on the two tracts are conceded to have been already de-

stroyed, certainly constitute an estate of no inconsiderable value.     Yet it would manifestly, from what appears in this case, be better for him, pecuniarily, to see the whole absolutely destroyed, than alone, unaided by others, to attempt to maintain this litigation.    And if his interests are not sufficient to justify the contest, what other one man in the district could afford to make the effort?    These facts are referred to as legitimately bearing upon this question of the effect of mere delay as evidence of acquiescence.    A man may well delay, or even decline, to seek redress for his wrongs from the necessity of the case, because he is conscious of an absolute inability to cope with the wrong-doer, or because he would suffer more in seeking a remedy than by succumbing to the wrong, and not because he acquiesces in the injury, or in any sense recognizes the validity of the adverse claim. To succumb to an overpowering force, is not necessarily to acquiesce in the wrong inflicted by it.    One may well submit from necessity to what he cannot help without admitting, but still denying, the right set up by an adverse claimant.    The mere delay, then, of Woodruff, or any other sufferer from the nuisance complained of, has very much less significance and probative force as evidence to establish acquiescence in the wrongs committed by defendants, within the meaning of that term as used in the law as an element in a title or right acquired by prescription, than a neglect to sue in the example first given. One may delay because he assents to and acquiesces in the adverse claim, while the delay by the other may well result from his inability to cope with the wrong-doers, while he denies their right and spurns their adverse claim.

The situation of complainant with reference to the expense and other obstacles referred to in the way of obtaining redress for the injuries suffered from the nuisance, and of every other party in a position to be similarly injured by it, was sufficiently discouraging and obvious to account for any delay that has accrued in bringing suit, without supposing that he or they acquiesced in any adverse claim that might have been made by defendants to an easement in their property and a right to commit the nuisance.    There has been no evidence brought to our notice tending to show an assent to or acquiescence in any right claimed by defendants to the easements now set up as a defense, other than a *mere delay* to commence suit. Nor is there any evidence, other than the mere fact that defendants, in common with other miners, have continued to discharge their mining *debris* into the streams below their mines in the mountains, or that defendants ever, while the time for prescription is claimed to have been running, or even before litigation was actually moved, claimed adversely an easement in or any right to bury the lands of complainant and others with their *debris*.    In our judgment, the mere fact that defendants, in common with hundreds or thousands of other miners in like situations, have poured their *debris* into the rivers 50 miles away, and that it has unavoidably, by the natural currents of the

streams, been carried down, and found its way to, and been discharged upon, the property of complainants and others, to their great damage, is not sufficient evidence of an open, notorious, adverse claim to an easement in the lands to avail defendants; and that an adverse claim is not so distinctly and unmistakably brought to the knowledge of complainant and others injured by such means alone as to set the time for prescription running. We do not think, under the circumstances, that complainant and others similarly situated should be presumed to know that the parties committing the nuisance were doing it under a claim of right adverse to them; especially so, as there is really *no substantial or even plausible ground under the laws of the state upon which to base such a claim.* Such a claim would be purely arbitrary and tortious.

Besides the want of other evidence of an adverse claim, and of knowledge of such claim brought home to complainant, there is evidence to the contrary. Within the last five years, as we have seen, the miners of their own motion spent $85,000 in building a levee eight miles in length along the line of high land on the south side of the river from the Hedges grade to the foot-hills, of which sum defendants contributed 80 per cent., for the very purpose of confining their *debris* to the present bed of the river between the levees and preventing it from spreading over the adjacent country, including the Eliza tract, upon which it would necessarily flow on that side if the land were wholly unprotected. If the defendants, then, made an open, notorious, adverse claim of right against the complainant and others similarly situated, why incur this great expense to protect land which they had a right to cover? Was it from pure benevolence? Or were they not moved rather by a consciousness that they were committing a nuisance, which, unless obviated, must sooner or later necessitate a suspension of their operations by an appeal to the courts for redress? Which is the more reasonable hypothesis? So, also, the complainant, in connection with other property owners similarly situated, from the time when it became apparent that they must suffer from the accumulation of *debris* instead of allowing the miners to pour their *debris* upon other lands not yet destroyed or covered, constructed levees for the purpose of excluding it. And they have ever since, from year to year, taxed themselves upon their property to an amount equal to or even greater than the whole ordinary net incomes of such property. There was an earnest, continued effort to protect themselves by means other than the almost impracticable and hopeless task of stopping the work of so large a number of miners by legal process.

But this action and forbearance is not necessarily inconsistent with the idea of non-acquiescence in the claim of an easement now set up. The people injured, including complainant, had a right, if possible, to protect themselves by other, and in view of the circumstances to them apparently more practicable and advantageous, means than legal proceedings,—means which should be compatible with a continuance of

mining, and which would, therefore, be less injurious to the miners themselves.   They also had a right to wait and see the effect of their efforts, without prejudice to their right to adopt proper legal remedies in the end if their other efforts made should not prove effective.   It is a matter of public notoriety with which everybody in the state must be familiar, and to which we cannot shut our eyes if we would, (*Sparrow* v. *Strong*, 3 Wall. 97,) that the people more immediately affected by mining *debris* have for many years—from the first—complained and protested against these injuries, and sought legislative interposition to aid in their protection, in addition to their strenuous efforts to protect themselves.   It is impossible to segregate this complainant and each individual miner from the large classes to which they belong, and treat them with reference to this question of acquiescence as isolated individuals,—as though they alone were the interested parties.   But the sufferers have not slept on their rights in other respects. In addition to the drainage act already referred to, the state, at the instance and with the approbation at the time, doubtless, of all concerned, both in the valleys and the mines, expended several hundred thousand dollars, raised by a special tax under a statute afterwards adjudged unconstitutional by the courts, in further efforts by impounding dams to prevent the nuisance complained of, and others of a similar character.   Failing to obviate the nuisance by any other means, the citizens of the valley were at last compelled to fall back upon their legal rights, and invoke relief from the courts.   They thereupon, at a reasonably early period, commenced a number of suits at different times, as circumstances and the difficulties encountered developed a necessity for them, like the one under consideration, of a representative character, in various forms and in different courts,—some in the name of the people, some in the names of counties and cities, and others in the names of private parties,—and these suits were defended by the miners.   *Keyes* v. *Little York, etc., Co.* was commenced as long ago as January, 1877; removed to this court; remanded to the state court, the order remanding having been appealed to and affirmed by the supreme court, (96 U. S. 199;) and finally tried by the state court, in which there was a decree for complainant.   The decree obtained was reversed on appeal in 1879, without a decision on the merits, on the *technical ground of misjoinder of parties defendant.*   53 Cal. 724. In September, 1879, the city of Marysville commenced a suit in the district court of Yuba county, presided over by Judge KEYSER, alleging the same state of facts as relied on in the present case, and asking similar relief, in which a preliminary injunction was granted. Afterwards the North Bloomfield Gravel Mining Company, a defendant in that suit and also in this, with others of the defendants therein, filed a petition for a writ of prohibition in the state supreme court, alleging that Judge KEYSER was the owner of two lots in Yuba city, Sutter county, on the Feather river, just above the confluence of Feather and Yuba rivers; that "the channel of Feather river for a considerable

distance above respondent's land was filled up by the sand and other sediment brought down by the Yuba river, so as to raise the bed of Feather river to the same height with the bed of the Yuba, and that the same causes which fill up the bed of the Yuba cause sand and sediment to be carried from the Yuba into Feather river and fill up the channel of the same opposite to and *upon the lands of respondent;*" that the respondent was therefore interested in the controversy and disqualified to act in the case. The supreme court so held in July, 1881, and issued the writ. · 58 Cal. 321. *People* v. *Gold Run, etc., Co.* was commenced in July, 1881, to restrain similar nuisances on Bear river, in Yuba county, and tried in 1882, resulting in a decree for injunction,—a very able opinion having been delivered in the case by Judge TEMPLE, of Sonoma county, formerly of the supreme court of the state,—from which decree an appeal is now pending in the supreme court of the state. A similar suit of *Sutter Co.* v. *Miocene Mining Co.* was commenced in a state court in June, 1881; removed to this court, and remanded to the state court, where it is now supposed to be pending. Other suits, commenced at various times, are pending.

These facts, showing the early, continued, and persistent action of the people affected, both in a public and private capacity, by common efforts to secure common relief from a common nuisance, and the difficulties encountered, may properly be considered as bearing upon the question of acquiescence. In view of all the circumstances surrounding this case, there certainly was no want of anxious vigilance on the part of complainant and his co-sufferers in their attempts to guard against and protect themselves in some form, and for a considerable time in a form most favorable to the interests of the defendants themselves. Having failed in their milder and more peaceful efforts, it would now be to the last degree inequitable to hold that they have lost their rights to all effective compulsory remedies by acquiescence and prescription, and that defendants, by their long-continued trespasses, have established a legal right in their lands to continue and augment the nuisance.

One of the counsel for defendants, in his very able printed argument, gives a definition of acquiescence from Rapalje & Lawrence's Law Dictionary, which he seems to regard as more favorable to defendants than that of complainant's counsel. It is as follows: "Acquiescence—Latin, *acquiesco,* to rest. Acquiescence is where a person, who knows he is entitled to impeach a transaction, or *enforce a right,* neglects to do so for such a length of time that, *under the circumstances of the case, the other party may fairly infer that he has waived his right.*" If we adopt this definition, we shall reach the same result. Is it possible to believe, from the facts disclosed by the record, that the complainant in this case has neglected to impeach the transaction in question "for such a length of time that *under the circumstances of the case the other party may fairly infer that he has*

*waived his right?"* It seems to us that *"the circumstances of the case"* suggest the negative as the only admissible, or even possible, answer.

In our judgment there is no sufficient evidence of an open, unqualified, undisguised, adverse claim to the easement now claimed by defendants in complainant's land, brought to the knowledge of the complainant during the entire period while the time for prescription is claimed to have been running, but if there was any such adverse claim of right made, and brought to complainant's knowledge, that then there is no such satisfactory evidence of any acquiescence in such claim of right on the part of complainant as is sufficient to give a title by prescription within the meaning of the established and recognized rule on that subject. Indeed, it is in the highest degree improbable, if not impossible, in the nature of things, that there should be such acquiescence. But, if otherwise, the prescriptive right could, in any event, only extend to the 75 acres of the Eliza tract, the 50 acres of the Hock Farm tract, and the other lands situate between the levees of the Yuba, already covered and destroyed. There could have been acquired no prescriptive right to extend the injury to other lands by continuing to send down other refuse matter from the mines, and raising the level of the bed of the river, by deposits of *debris* between the levees, higher and higher from year to year, thereby constantly and surely increasing the danger of breaking the levees, and discharging their augmented contents upon the surrounding country not yet destroyed. That an increase of these deposits, already elevated several feet above the level of the country outside the levees, must greatly enhance the danger, and in an increasing ratio, cannot fail to be obvious to the most superficial and least-informed observer. These barriers, upon which the *present* and future safety of Marysville and the adjacent country depends, are even now, with the present level of the *debris* confined within the levees, frail indeed, when compared with the forces of nature; liable at any time during our rainy season to be turned against them by any accidental obstruction to the currents of the flood. The temerity of those who trust their lives and fortunes to the protection afforded by these relatively feeble barriers during a flood is well calculated to excite wonder.

The brief flood occasioned by the breaking of the English dam, in June last, afforded a striking illustration of what is liable hereafter to occur. This enormous deposit of *debris* in the Yuba, at and near Marysville, and in the streams in the mountains above, is a continuing, ever-present, and, so long as hydraulic mining is carried on as now pursued it will ever continue to be, an alarming and ever-growing menace, a constantly augmenting nuisance, threatening further injuries to the property of complainant, as well as the lives and property of numerous other citizens similarly situated. Against the continuous and further augmentation of this nuisance the complainant must certainly be entitled to legal protection.

Laches is also relied on to defeat the suit. This is a defense that appeals to the sound legal discretion of the court, and depends largely upon the circumstances under which the delay occurs. It rests upon the principle that a court of equity will only aid the vigilant. Under the conditions shown in discussing the defense of prescription, which need not be repeated, no court of equity, we think, would deny relief to the complainant on the sole ground of laches. Besides, the nuisance complained of is a continuing, ever-present, and ever-increasing one, and constantly and day by day affords new grounds for equitable relief. It is sought to restrain further threatened injuries to complainant's property,—injuries liable to occur at any time, and quite certain to be inflicted sooner or later.

As to the 75 acres of the Eliza tract and 50 acres of the Hock farm covered by *debris*, and destroyed for agricultural purposes, the defendants specially deny title in complainant, and plead title in themselves in common with all other miners, under the statute of limitations. An adverse possession of land for five years confers a title in this state. *Arrington* v. *Liscom,* 34 Cal. 365; *Cannon* v. *Stockmon,* 36 Cal. 535. But the Code of Civil Procedure, in section 325, expressly provides, "for the purpose of constituting an adverse possession by a person claiming title, *not founded upon a written instrument, judgment, or decree, land is deemed to have been possessed and occupied in the following cases only:* (1) *Where it has been protected by a substantial inclosure;* (2) *where it has been usually cultivated or improved.*"

These tracts of land were not "protected by a substantial inclosure," and were not "cultivated or improved" by defendants, and were neither possessed nor occupied at any time or in any other manner, or to any other extent, than as they were covered by *debris* thrown upon them by defendants in common with many other miners working independently of each other. Nor did defendants attempt to exercise any personal control, or acts of ownership or dominion, over them. In all other particulars these lands were under the management and control of complainant. They are, therefore, not within the provisions of the statute of limitations for the purpose of divesting the title out of complainant and vesting it in defendants. There was *no ouster* whatever. The defendants insist, however, that for their purposes an inclosure would be useless, and cultivation and improvement were out of the question; and they were not occupied for any such purposes. They claim a title, however, *under and by force of a statute,* and not otherwise. The statute conferring the right, therefore, must be the *measure* of that right; and it says for the purposes of acquiring that right nothing short of the conditions prescribed shall be sufficient; and in this case the prescribed conditions do not exist, nor is it pretended that they do; consequently, the title has neither been vested in defendants and all other miners, as claimed, nor divested out of complainant. There has never been a time when the complainant, if he had brought an action of ejectment

to recover possession of these lands against defendants and all other miners, could have maintained it, for the reason that there has been no ouster within the meaning of the statute relied on. A denial of ouster, which would certainly have been made, would have defeated any action to recover possession, and thrown the costs upon complainant; for, under the express terms of the statute, there was no ouster, and none, therefore, could be proved. There can be no right in defendants of any kind in these lands, then, unless they have acquired an easement in them for the deposit of their *debris* by prescription; and the question of a prescriptive right to an easement arises, which has already been discussed and decided.

But as these two tracts of 75 and 50 acres present the strongest grounds for holding that defendants have acquired an easement as to them, although it is not necessary to a decision of the case based upon other injuries, past, present, and threatened in the future, these further observations upon acquiescence are appropriate. The complainant is but one out of many similarly situated with reference to injuries effected by these same mining operations. We have seen that an action of ejectment could not at any time have been maintained for want of an ouster. The complainant could, therefore, not be required to bring an action of this kind, where there was no legal ground for it, for the mere purpose of expressing his dissent from a claim of right to cover his lands to their injury. But assuming that he could maintain an action of trespass for damages for the injury, in that case he would be compelled to sue every miner in the whole mining region on the waters of the Yuba individually, in a separate suit, as they clearly could not be joined in an action at law for the trespass, in order to complete protection of his property. Had he sued defendants, it would have been impossible to trace any specific portion of the injury to their acts, and only nominal damages could in any event be recovered. The law, certainly, is not so unreasonable as to require complainant to prosecute innumerable suits for trespass, which would result in nothing substantial, for the mere purpose of manifesting his non-acquiescence in the unlawful claims of these trespassers. A judgment without damages would not restrain future trespasses, and the proceeding must be repeated to prevent a loss of title by prescription, and so on *ad infinitum.* Besides, how is he to know who the hundreds and, perhaps, thousands of miners, scattered over the large territory 50 miles away, are, who are sending their *debris* down upon him, or know that each claims a legal right to use his particular land as a deposit for his refuse matter? The law does not require a vain thing to be done. A suit in equity to restrain further injuries, but not to recover damages for the past, might be brought, it is true; but it is unnecessary to repeat what we have already said on the subject of prescription and continuing nuisances. The case under consideration is *sui generis*, nothing like it in the books having been brought to our notice, and the rules of law must

be at least *reasonably*, if not *liberally*, applied to the peculiar facts of the case for the protection of the innocent owners of property against tortious encroachments, rather than for the encouragement of unlawful trespassers by enlarging their rights through their own tortious and unlawful acts. But if any easement has been acquired as to these two tracts, there still remain other injuries for which the complainant is entitled to the same relief.

The next defense is that the acts of defendants are authorized by the customs of miners, which have been recognized, confirmed, and legalized by the legislation both of the state and of congress. This legislation will now be considered. In 1851, the legislature of California, in the Code of Civil Procedure, made the following provision: "In actions respecting 'mining claims,' proof shall be admitted of the customs, usages, or regulations established and in force at the bar or diggings embracing such claim; and such customs, usages, or regulations, *when not in conflict with the constitution and laws of this state*, shall govern the decision of the action." St. 1851, p. 149, § 621. This provision has been carried into the last Code of Civil Procedure. Section 748. The act of congress of 1866 also provided that the mineral lands "of the public domain" shall be open to exploration and occupation, subject, also, to the *local* customs or rules of miners in the several mining districts, so far as the same may not be in conflict with the laws of the United States." 14 St. p. 251, § 1. And the act of 1872 further provided that "the miners of each *mining district* may make regulations *not in conflict with the laws of the United States, or the state* or territory in which the district is situated, governing the *location, manner of recording, amount of work necessary to hold possession of a mining claim*," etc., both of which provisions have been carried into the Revised Statutes. Rev. St. §§ 2319, 2324.

The first observation suggested is that none of these provisions, either state or national, have any relation at all to the subject matter of this suit. They simply recognize and legalize customs and regulations by which miners' rights, as between themselves, upon the public lands, may be secured, regulated, and protected. They relate to "mining claims" alone,—to the manner of acquiring and protecting rights in them. They refer to the extent of the claim, the manner of taking up and holding it, the evidence of title, etc., as between themselves and as against each other, and in the state legislation, not as against the government or owner of the land. Much less does it attempt to give them rights as against private parties, vested with the fee of other lands not mining, and not even within the mining regions. It has no relation to lands owned in fee by private parties. The principle acted upon was to regard the miners, as against everybody except the owner of the lands in which the mines were found, as the proprietors of limited portions of the mines on the public lands actually in their possession and occupation, and to prescribe rules for the acquisition, regulation, and protection of such limited rights.

The principle acted upon is fully stated, with reference to other public lands, in *Lamb* v. *Davenport*, 1 Sawy. 620; and this statement of the principle was approved by the supreme court of the United States in *Stark* v. *Starr*, 94 U. S. 487, note. The provision in no way interferes, or attempts to interfere, with the rights of the owner of the fee, even in these lands, much less in any other lands; nor does it authorize, or attempt to authorize, any custom or usage or regulation which shall encroach upon the rights of others owning agricultural lands in fee, situate in the valleys many miles distant. On the contrary, it is expressly provided that "such customs, usages, or regulations shall govern" only "*when not in conflict with the laws of the state.*" A custom or usage attempted to be established, whereby mining *debris* might be sent down to the valleys, devastating the lands of private owners, holding titles in fee from the Mexican government, as old as the title of the United States, without first acquiring the right to do so by purchase or other lawful means, upon compensation paid, would be in direct violation both of the laws and constitution of the state and of the constitution of the United States. Instead of being authorized by the statute, it would be in direct violation of the statute. It would also be in direct violation of the express provisions of the statutes defining nuisances already cited.

One of the earliest statutes passed by the first legislature of California adopted the common law as the rule of decision in this state, (St. 1850, p. 219;) and that statute has been in force ever since, except so far as modified by the Civil Code. *Sic utere tuo ut alienum non lædas* is one of the fundamental maxims of the common law, more frequently cited and enforced, perhaps, than any other in the law. And this maxim is still continued in force in section 3514 of the Civil Code of California, where it is translated: "One must so use his own rights as not to infringe upon the rights of another." Any custom or usage which would attempt to authorize the acts complained of, would clearly violate this fundamental principle of the law. A case was cited where, in commenting upon some very *remote* consequences of an act, the judge observed that this rule was too indefinite to furnish a certain rule to be guided by in many cases; and it was insisted by counsel that it really had little significance or value; but this case does not lie so near the line of distinction as to be open to doubt as to its application. No possible refinement or legal hair-splitting can exclude it from the operation of the rule. It is obviously within the rule, and so far from the borders as to leave no possible ground for doubt as to its applicability. The first section of both the old and new state constitutions provides that "all men * * * have certain inalienable rights, among which are those of * * * acquiring, possessing, and protecting property." These rights must necessarily include the right to enjoy, without let, hinderance, or obstruction by others, the property so acquired, possessed,

and protected; and it is not competent for the legislature to authorize any encroachment upon the rights of one class of citizens by custom or usage adopted by those pursuing any particular class of industries.    Again, as we have already seen, by other constitutional provisions it is provided that "private property shall not be taken or damaged for public use without just compensation having been first paid," etc., and "no person shall be deprived of  *  *  *  property without due process of law;" and the same inhibition is put upon the states by the amendments of the national constitution.

The customs and usages relied on would be in direct conflict with all these provisions, and consequently, if any such there are, they cannot be valid.    The customs recognized and validated by congress are only the same "*local*" customs before recognized by the state legislation, except that the acts of congress not only regulate these matters among miners as between themselves, but also give them some rights as against the United States in the public lands, but in no other lands.    And the limitation expressly put upon these customs and usages is that they shall not be "in conflict with ·the laws of the United States or the state  *  *  *  within which the district is situated."    Thus congress is also careful not to give any countenance to the idea that private rights can be encroached upon under the guise of the customs or usages of miners intended to be legalized. Again: these customs and usages recognized are "*local*" customs, limited to the "bar or diggings" within which they are situate.    They are not *general* customs, and such customs and usages as are set up· in this particular are not within the legislation invoked.    Besides, customs to be valid under the common law must be reasonable.    Can a custom or usage which would allow the whole of the Sacremento and other valleys of California to be filled up and devastated, no matter how well improved or largely peopled, be reasonable?    Such a custom would be valid if the custom relied on is valid.    It is only a matter of degree, not of principle.    The supreme court of California has never recognized the validity of any custom to mine in such a manner as to destroy or injure the property of others, even in the district or diggings where the local customs and usages of miners are sanctioned by the statutes.    But the California reports are full of cases where the principle has been enforced in the mines that every one must so use his own property as not to injure another.

Said the supreme court in *Hill* v. *Smith*, 27 Cal. 482: "This notion [that the rules of the common law as to water rights have been modified in California] is without substantial foundation.    The reasons which constitute the groundwork of the common law upon this subject remain undisturbed.    The conditions to which we are to apply them are changed, and not the rules themselves.    The maxim, *sic utere tuo ut alienum non lædas,* upon which they are grounded, has lost none of its governing force; on the contrary, it remains now, and in the *mining regions* of this state, as operative a test of the law-

ful use of waters as at any time in the past, or in any other country." And in *Richardson* v. *Kier*, 34 Cal. 74, the court said: "He is bound to so use his ditch as not to injure his neighbor's land, irrespective of the question as to which has the older right or title, * * * and if, through any fault or neglect of his in not properly managing and keeping in repair, the water does overflow or break through the banks of the ditch and injure the lands of others, *either by washing away the soil or covering the soil with sand, the law holds him responsible;*" and these are but examples of many others too numerous to mention, and too familiar in this state to require citation. The supreme court of the United States recognizes the principle of the maxim also in *Jennison* v. *Kirk*, 98 U. S. 461. Said the court: "The position of the testator's ditch prevented this working, and thus deprived him of this value of the water and practically destroyed his mining claim. No system of law with which we are acquainted tolerates the use of one's property in this way so as to destroy the property of another."

We are fully satisfied that acts of the defendants complained of are not authorized by any valid custom or usage, or by any valid law, statute or otherwise, of the state of California or of the United States; and that complainant is entitled to such relief as shall fully and amply protect him from any further injuries to his property and any further encroachments upon his rights. What shall the remedy be? It would be difficult to appreciate too highly the importance of the mining interests. The fact is patent that immense sums of money have been and they are now employed in this branch of industry. The boldness with which capitalists, and especially these defendants, have invested large amounts of capital; the perfection to which those engaged in hydraulic mining have brought machines and appliances for successful mining; the vast enterprises they have undertaken and successfully carried out; the energy, perseverance, great engineering and mining skill displayed in pursuing these enterprises,—excite wonder and unbounded admiration. In view of these undisputed, indisputable, and well-known facts, no one could possibly be more averse than we are to applying any remedy to the grievances complained of that must put an end to hydraulic mining, if any other can be devised admitting of its continuance, compatible with the safety and rights of the public, the complainant, and numerous others similarly situated, of whom he is a representative. We have therefore sought with painful anxiety some other remedy; but none has been suggested that appears to us to be at all adequate to the exigencies of the case, or at least none available in the present stage of the case. Two were suggested in Mendell's report: (1) The purchase of large tracts of low lands in the valleys, which are now or may be permanently covered with water, without material injury to navigation, or other property owners, and turning the entire Yuba river, with its *debris*, into them, using them as settling reservoirs. (2) The building of im-

pounding dams at suitable points on the river to hold back the heavier portion of the *debris*.

The first seemed to be regarded as too expensive to be feasible. The second is the only one suggested and urged in this case, and much testimony has been taken as to the practicability and safety of the plan. As is usually the case, the views of different engineers and experts distinguished in their profession, differ widely upon the points of practicability and safety. The larger number of witnesses called, and much the larger amount of testimony, so far as mere opinion goes, are doubtless in favor of the practicability, *if sufficient means are furnished*. But all the practical experiments heretofore made, at great expense, under the supervision of the state and of competent engineers, have been lamentable failures. The dams constructed were doubtless, in many particulars, defective. But what guaranty have the court, and those whose lives and property are at stake, that any future works of the kind will not also be defective? As at present advised, with some knowledge of the operations of the tremendous forces of nature, we cannot undertake to say, upon the mere opinion of experts generally at variance, as in this case, however competent, that the scheme would be practicable and safe. We cannot define in advance what works shall be sufficient, and authorize the continuance of the acts complained of upon the performance of any prescribed conditions.

In view of past experience here and elsewhere, with the damming up of waters, and of the wide difference of opinion of competent engineers on the subject, it is clear that we should not be justified in an attempt to prescribe in advance any kind of a dam under which a large community should be compelled to live in dread of a perpetual, seriously alarming, and ever-present menace. Even the pure waters of Niagara, within the memory of man, have made a sensible impression upon their bed of compact rock, adapted to its purposes by an Almighty and Omniscient power. Portions of its solid walls from time to time yield to the force of the mighty flood, and are precipitated into the abyss below. Says the author of the article on Niagara Falls in the New American Cyclopedia: "In the short period hardly reaching back into the last century, during which observations, other than those of passing travelers, have been made and preserved, changes have taken place by the falling down of masses of rocks, the effect of which has been to cause a slight recession of the cataract, and extend the gorge to the same amount upward towards Lake Erie. Thus, in 1818 great fragments descended at the American fall, in 1828 at the Horseshoe fall, and since 1855 several others have materially changed the aspect of the falls." Vol. 7, p. 418. When Father Hennepin first visited Niagara, in 1678, there was a third fall formed on the Canada side by a huge rock, which divided and turned the current. At the time of the visit of the Swedish naturalist, Kalm, in 1750, the rock had fallen down and left the cataract, in respect

to the number of falls, more nearly in its present condition.  In 1842 Prof. Hall made an exact scientific, trigonometrical, and geological survey of the falls, and from his survey and map "a vivid and exact idea has been formed of the enormous mechanical powers which are at work here.  *  *  *  The falling water acts as a huge saw, cutting a channel in the rock at the rate of about one foot a year." 3 Johnson's New Cyclopedia, 839.

These facts forcibly illustrate the tremendous power of the element against which the engineer must contend in his efforts to impound the mining *debris*.   Yet it is proposed to erect a barrier in the narrows of the Yuba, upon a bed of *debris* now 60 feet deep, just out of the foot-hills, 150 feet high,—as high as Niagara,—over which its waters, concentrated in a narrow gorge, charged at times to their full carrying capacity with heavy material, on occasions of great floods will pour in volumes equal, perhaps, or nearly so, to those pouring over an equal space at Niagara.   It is said that this proposed dam will be a *debris*-dam, and less dangerous than a water-dam.   But Niagara cannot be said to be a water-dam in any other sense then the one proposed, when filled, or nearly filled, with *debris*.   The danger shown by the testimony will be, not so much from the pressure above as from the force and effects of the water charged with *debris*, sometimes with stones of greater or less dimensions, falling over and down the dam so great a distance.   According to the testimony of Hamilton Smith, the very intelligent, competent, and reliable engineer who built the English dam, there were rocks in it of 10 tons weight, not a vestige of which could be found after the breaking of the dam in June last.   They must have either been carried by the floods down the stream, or crushed into fragments by the overpowering forces brought to bear upon them.   And according to the testimony of another witness, who followed down the Yuba to observe the effects of the torrent resulting from the breaking of that dam, rocks of much larger dimensions, before existing in the bed of the river, had wholly disappeared.   The facts stated show the enormous resisting power required to render an impounding dam perfectly safe.   Engineers, as before stated, differ as to the practicability of building a safe dam at that or other indicated points.   We cannot presume to determine the possibilities of engineering skill in constructing these restraining dams, with "money enough" at command, where distinguished engineers differ in opinion upon the problem.   It is enough for us to know that the matter rests in *mere opinion*, and that the opinions of men eminent in their profession are not in accord upon the question.   It is obviously impossible that the court should determine in advance what dams may be built that will be sufficient, or prescribe any conditions upon the fufillment of which defendants should be permitted to continue the acts complained of.   According to the testimony of some intelligent witnesses, only about 70 per cent. of the *debris* would be retained by any dam, as all that the water is capable of carrying in

suspension would pass over under any circumstances. This percentage of the enormous quantity yet to be mined would add a great deal to the amount now in the streams. A large amount, at all events, would necessarily pass over. Dams, such as are proposed, properly constructed, and not carried too high, may well be safe, and extremely valuable in keeping back the *debris* now in the stream, and largely mitigating the injuries now existing and threatened, even though utterly inadequate to protect the valleys below, in case hydraulic mining is continued, and enormous quantities of *debris* be added to that already accumulated. But there are no dams now of any appreciable service in protecting the rights of complainant from further injury, either from the *debris* already in the streams, or such further accumulations as may arise from a continuance of hydraulic mining as now pursued. There is, therefore, no alternative to granting an injunction.

A great deal has been said about the comparative public importance of the mining interests, and also the great loss and inconvenience to these defendants if their operations should be stopped by injunction. But these are considerations with which we have nothing to do. We are simply to determine whether the complainant's rights have been infringed, and, if so, afford him such relief as the law entitles him to receive, whatever the consequence or inconvenience to the wrong-doers or to the general public may be. To similar suggestions in *Atty. Gen.* v. *Council of Birmingham,* where the sewage of the city, having a population of 250,000, was the nuisance complained of, the vice-chancellor said:

"Now, with regard to the question of plaintiff's right to an injunction, it appears to me that, so far as this court is concerned, it is a matter of almost absolute indifference whether the decision affects a population of two hundred and fifty thousand, or a single individual carrying on a manufactory for his own benefit. * * * I am not sitting here as a committee of public safety, armed with arbitrary power to prevent what, it is said, will be a great injury, *not to Birmingham only, but to all England;* that is not my function." 4 Kay & J. 539.

See, also, *Spokes* v. *Banbury Board of Health,* L. R. 1 Eq. Cas. 47.

So, in *Atty. Gen.* v. *Colney Hatch Lunatic Asylum,* the lord chancellor observes:

"It is said * *   unless the defendants are permitted to throw all their sewage upon their neighbors' lands, upon which they have no more right to throw it than into this court, they cannot carry on the asylum, [which contained two thousand two hundred patients;] and therefore they contend that they must be permitted to dispose of the whole of the sewage on their neighbors' lands. Surely, the mere statement of the proposition is quite sufficient to refute it. Nobody can suppose the law of England to be in that state. It is not to be supposed that because we are told, as I was told in the case of *Atty. Gen.* v. *Birmingham,* that three hundred thousand people will be very much inconvenienced if they are not allowed to use their neighbors' property without paying for it; that on that account they are to use their neighbors' property without paying for it. * * * This court has merely to decide what the law is as it exists, and to see that it is duly administered; not

to order anything done that is impossible, as in the illustration I have given, *but to take care, subject to that modification, that persons shall be restrained from exercising with a high hand powers which* they have no right in law to exercise." L. R. 4 Ch. App. Cas. 155.

In these cases the acts causing the nuisance were urged as absolutely necessary to the safety of the people interested,—to 300,000 people, in the case of the city of Birmingham,—but the defendants were plainly informed that it was not the duty of the court to point out how the nuisance should be avoided, but that, however necessary to the safety or convenience of those interested in the continuance, they must find a way to prevent the nuisances, or cease to perform the acts which occasioned them.    Certainly, the law is not less favorable to the protection of the rights of every man, under the several express constitutional restrictions before referred to in this country, than it is in England, where there are no such limitations on the legislative power. And authority is not wanting to the same effect in our own reports. In *Weaver* v. *Eureka Lake Co.* 15 Cal. 274, the court said:

"It is contended that, under the circumstances, the erection of the dam was justifiable and proper, and that the great value of the lakes as reservoirs is a sufficient justification for the injuries resulting to plaintiff. We are aware of no principle of law upon which such a position can be maintained.   *   *   * A comparison of the value of conflicting rights would be a novel mode of determining their legal superiority."

And in *Wixon* v. *Bear River, etc., Co.* 24 Cal. 373, the court said:

"The four remaining instructions refused by the court are founded upon the theory that, in the mineral districts of this state, the rights of miners and persons owning ditches constructed for mining purposes are paramount to all other rights and interests of a different character, regardless of the time or mode of their acquisition; thus annihilating the doctrine of priority in all cases where the contest is between a miner or ditch-owner, and one who claims the exercise of any other kind of right, or the ownership of any other kind of interest.   To such a doctrine we are unable to subscribe, nor do we think it clothed with a plausibility sufficient to justify us in combating it."

But authority is not necessary on so plain a proposition.   Of course, great interests should not be overthrown on trifling or frivolous grounds, as where the maxim *de minimis non curat lex* is applicable, but every substantial, material right of person or property is entitled to protection against all the world.   It is by protecting the most humble in his small estate against the encroachments of large capital and large interests that the poor man is ultimately enabled to become a capitalist himself.   If the smaller interest must yield to the larger, all small property rights, and all smaller and less important enterprises, industries, and pursuits would sooner or later be absorbed by the large, more powerful few; and their development to a condition of great value and importance, both to the individual and the public, would be arrested in its incipiency.   But if the comparison could be made in this instance, it would be impossible to say that the interests of the defendants, and of those engaged in the same pursuits, would be more important than those of complainant, and such as he repre-

sents in this contest. The direct contrary is maintained by complainant with great force and plausibility. But we have nothing to do with this question as to the comparative importance of the conflicting interests, or the inconvenience to the defendants by the stoppage of their works, if they infringe the material, substantial rights of others. It is the province and imperative duty of the court to ascertain and enforce the legal rights of the complainant, no matter what the consequence to defendants may be. This duty no court could evade if it would.

Since the decision on the demurrer, in April last, the *anti-debris* association, their leading counsel, and the agent of complainant, doubtless acting under the advice of counsel, have used their influence with the secretary of war to induce him not to expend the appropriation of $250,000, made by congress, for "the improvement and protection of the navigable channels of the Sacramento and Feather rivers," in the erection of a dam at the narrows of the Yuba, for impounding the *debris* of the mines; and the secretary of war has, hitherto, declined to so expend the appropriation. It is earnestly urged by defendants, as a last defense, that this action of complainant, and his associates in interest, in using their efforts to obstruct the erection of a dam, intended to obviate the evils complained of, should, in a court of equity, deprive them of any right to an injunction which they might otherwise have had. This action may have been extremely unwise, and we are inclined to think it was, so far, at least, as a dam at that point, of a proper construction and safe height, might afford protection against the *debris* now in the streams above, or mitigate the evils resulting from it—a protection that, in any event, is most sorely needed. But we are not prepared to say, in view of their opinion as to the safety of such dams, supported by the views of their engineers and experts, and their past experience in regard to them, that their opposition to the erection of a dam as a safe remedy against further accumulations of vast amounts of *debris* that must, of. necessity, result from a continuance of mining as now carried on, should deprive complainant of the more certain, safe, and effectual relief to which he and his associates consider themselves to be entitled under the law. We do not perceive any good reason why the complainant and those in like situation should not endeavor to carry out their own views as to what their safety requires as well as defendants theirs. They, and not the defendants, are the ones to suffer from any defective means of protection that may be attempted to be carried out. We think this action constitutes no good ground for denying an injunction. But if action of this kind, under any circumstances, could constitute a good answer to an application for an injunction, some latitude, surely, would be allowed to those struggling, almost hopelessly, for existence against impending dangers. We cannot deny an injunction on that ground.

After an examination of the great questions involved, as careful and

thorough as we are capable of giving them, with a painfully anxious appreciation of the responsibilities resting upon us, and of the disastrous consequences to the defendants, we can come to no other conclusion than that complainant is entitled to a perpetual injunction. But as it is possible that some mode may be devised in the future for obviating the injuries, either one of those suggested or some other, and successfully carried out, so as to be both safe and effective, a clause will be inserted in the decree giving leave on any future occasion, when some such plan has been successfully executed, to apply to the court for a modification or suspension of the injunction.

Let a decree be entered accordingly.

DEADY, J., *concurring.* I fully concur in the learned and able opinion of the circuit judge in both its reason and conclusion. It exhausts the subject, and leaves nothing to be added, either by way of statement, argument, illustration, or authority. Under these circumstances, but for the magnitude of the subject and the great interest felt in the question, I would not deem it necessary to say more than this. And as it is, I shall only briefly state the conclusions I formed and set forth at the close of the argument; and after the personal examination of the mines, mining operations, water-ways, and the adjacent country, I am by no means unconcerned or indifferent to the effect of this decision upon the large capital invested in these mines. But it is a fundamental idea of civilized society, and particularly such as is based upon the common law, that no one shall use his property so as to injure the right of another—*sic utere tuo ut alienum non lædas.* From this salutary rule no one is exempt,—not even the public,—and the defendants must submit to it. Without it the weak would be at the mercy of the strong, and might make right.

It is admitted by the pleadings and upon the argument of this case that the defendants, by means of the hydraulic mining carried on by them on the head-waters of the Yuba river, materially aid in producing the following results: (1) The water of that stream and Feather and Sacramento is fouled so as to be unfit for ordinary domestic purposes; (2) the beds of these rivers are continually being filled up with the *debris* from said mines so as to seriously impair the navigation thereof, and cause them to overflow their banks and injure and destroy large portions of the adjacent agricultural lands, by washing away the soil and improvements thereon, or covering the surface with said *debris* so as to render them wholly unfit for cultivation; (3) the property in the town of Marysville, at the junction of the Yuba and Feather rivers, is ever in danger of being overflowed and seriously damaged or destroyed by the floods so caused, to prevent which the owners thereof are and have been compelled to construct and maintain, at a large and continuing expense, levees around the greater portion of the town; (4) the fill in these rivers from the deposit of *debris* therein is materially and constantly increasing from year to year, and in

the case of an unusually high water it may, and probably will, be greatly and suddenly increased, so that all the danger and injury resulting to the navigation of these rivers and the property adjacent thereto is constant, increasing, and will continue to increase with the continuance of the cause thereof—the hydraulic mining of the defendants as now practiced and carried on.   Undoubtedly the acts of the defendants constitute a public nuisance, and the plaintiff being specially injured thereby, both in his farm and city property, has an undoubted right to maintain this suit for relief; and in the consideration of the questions which arise in the case, he ought to be regarded, not as an isolated individual suffering from a particular wrong, but as the representative of his co-sufferers in the community from the same wrong of which he complains.

The principal defense or justifiation of this wrong rests on three points :

(1) That the United States and the state have impliedly authorized the defendants, and all other hydraulic miners, to send their *debris* down these rivers regardless of the injurious consequences to the navigability or the adjacent property; (2) that the defendants have done the acts complained of for so long a time and under such circumstances as to acquire a prescriptive right to continue the same; and (3) that the suit is barred by the statute of limitations of the state.   Sections 319, 343, of the Code of Civil Procedure.

In the exercise of its power to regulate commerce and establish post-roads, the United States may impair the navigability of a watercourse within a state; but it has no power, either as a land-owner or sovereign, to impair or obstruct the navigability of such water for the mere purpose of promoting or facilitating the working of mines upon the public lands, either by itself or its grantees.   The United States have not attempted, nor intended to confer upon the defendants any right or privilege, to foul or fill the waters in question, or to in any way injure the property of another, or impair the use or enjoyment thereof as a means of working their mines, or otherwise.   The act of July 26, 1866, (13 St. 251,) and the acts of July 9, 1870, (16 St. 217,) and May 10, 1872, (17 St. 91,) amendatory thereof, only purport to allow the "exploration" and "occupation" of the public mineral lands and to provide for their sale under certain circumstances, subject to the power of the state to make rules concerning "easements and drainage necessary to their complete development."   But this latter clause does not confer any power over the subject upon the state which congress did not possess.   Indeed, it is only a prudential declaration of what there ought never to have been any doubt about, that the sale by the United States to the purchaser did not prevent the state from exercising whatever police power it may of right have over the subject.

The state has not authorized the defendants to use these waters or the adjacent lands for the purpose of depositing therein or thereon

their mining *debris*, otherwise than by section 1238, subd. 5, of the Code of Civil Procedure, which provides that "dumping places for working mines" and "outlets, natural, or otherwise," for the flow of tailings may be taken under the right of eminent domain as for a public use. The supreme court of the state has already decided that this subdivision 5 is unconstitutional when applied to a case of a single person seeking to condemn private property as a dumping or flowing place for mining. *debris*. And it is difficult to see on what ground a taking of property by any number of persons for such a purpose can be held to be a taking of private property for a public use. But, be that as it may, this section does not authorize the defendants to use the plaintiff's land, or the easement appurtenant thereto, as a dumping ground or flowing place for the tailings from their mines, until the same has been duly condemned for that purpose and compensation made to the owner.

By section 3 of the act admitting the state into the Union, (19 St. 452,) it is declared "that all the navigable waters within the state shall be common highways." If these words mean anything, the state is thereby restrained from obstructing or authorizing obstructions to the navigation of the Feather and Sacramento, which shall prevent their being used as common highways, according to their capacity and condition when the state was admitted. See *Hatch* v. *Wallamet Iron Bridge Co.* 7 Sawy. 127; [S. C. 6 FED. REP. 326, 780.]

The defendants have no prescriptive right to do the acts complained of. And, *first*, there is no such continuity of possession, occupation, or use between these defendants and the many persons who may have preceded them in the occupation or working of the mines in this region, and the commission of similar wrongful acts to the injury of the plaintiff, or his co-sufferers, so as to entitle them to claim the benefit of such acts, or the time occupied by them in support of their plea of prescription. But as the rule is that the use of an easement for such time as the statute makes an adverse possession a bar to the recovery of the possession of the premises, establishes a prescriptive right thereto, this question is not material, as the defendants appear to have been in the use of the rivers and adjacent lands for the flow and deposit of their tailings for five years before the commencement of this suit. But this is a public nuisance. No one can acquire a right by prescription to commit a public nuisance as against the public; and I think the better opinion is, that an individual who sustains a special injury from such nuisance may maintain a suit for its abatement or an injunction to restrain its further commission without reference to the lapse of time. But it is essential to a prescriptive right to an easement in or upon the property of another that the owner should *acquiesce* in the use, while five years uninterrupted use of the waters of the Yuba and Feather by the defendants, as a place of flow and deposit for the *debris* of

their mines, so as to fill' the channels to a depth of no more than 10 feet, might, under some circumstances, be sufficient evidence of an acquiescence in such use by the plaintiff, it is not evidence of his acquiescence in the use of such waters for that purpose, so as to fill their channels to a depth of 11, 12, or more feet. The difference of one foot in fill may make a very material difference in the result to the plaintiff, both as to the navigation of the rivers and the depth and extent of the consequent overflow and deposit on the adjacent lands. In the case of a continuing and increasing trespass, it would be both illogical and unjust to infer an acquiescence in the latter and more injurious act, merely from an acquiescence, actual or presumed, in the earlier and less harmful one. Now, the evidence in the case shows beyond a doubt that the fill of the rivers and the consequent overflow and spread of the tailings has increased year by year for the past 10 years. And if the defendants continue to work their mines as they have done, this increase may reasonably be expected to go on from year to year, requiring an additional outlay for the erection and elevation of levees each year, and causing greater risk and danger to the persons and property in their vicinity.

There is no direct evidence of acquiescence in this case; and there is really little or no reason in the circumstances for saying that the plaintiff or the community, affected by the deposit of mining *debris* in these waters, ever acquiesced, in any proper sense of that term, in the conduct or state of things which has finally resulted so injuriously to him and them. Rather, it may be said, that they have borne a burden—not so heavy or dangerous at first, but gradually growing more so, until it has become intolerable—which, owing to the state of things heretofore existing in California, they could not well avoid if they would. But as the developments of later years, following the introduction into the mines of those wonderful hydraulic engines, "The Monitor" and "Little Giant," throwing a stream of water upon the gravel and sand banks in some instances of nine inches in diameter, under a pressure of from 200 to 500 feet, have shown the serious character of the injury produced and threatened to be produced by this Titanic and unlimited washing of the mountains into the rivers and on to the adjacent lands, the agricultural and commercial interests and communities injuriously affected thereby have begun to make themselves heard where once the temporary convenience and individual will of the miner was the only law. Since then the persons suffering from this wrong have objected and protested against its continuance in many ways, until finally they have, in the person of this plaintiff, appealed to this court for the relief to which they are entitled.

There is no statute of limitations applicable to this suit. Section 319 of the Code of Civil Procedure of California, cited by the defendants, is confined to actions involving the right to the actual possession of or the title to real property, and not a mere easement in the

land of another. When, by lapse of time, accompanied by an undisturbed user, a party acquires an absolute right to such easement, he is said to be entitled by prescription.

On the argument, counsel for the defendants insisted that dams could be built on the Yuba, above the valley, as, for instance, at a place called "The Narrows," just above Smartsville, that would prevent the flow of *debris* from the mines and permanently detain them in the mountain courses of the river; and upon this assumption it was asked that if the court found that defendants were committing a nuisance to the injury of the plaintiff, as alleged in the bill, it would, instead of enjoining them directly, require them to construct, or cause to be constructed, dams sufficient to impound their *debris* in the bed of the stream before it reaches the valley, and, in the mean time, allow them to operate their mines as at present. In other words, the court is asked to allow the defendants to continue the commission of the nuisance unrestrained until they can try the experiment of abating or preventing it by means of a dam. In my judgment, this would be a most lame and impotent conclusion from the premises. If the defendants can devise and carry out some lawful plan for impounding their *debris* in the mountains, they are at liberty to do so, so far as the plaintiff is concerned, but the experiment ought not to be tried at the expense of the plaintiff or by the denial or postponement of the relief to which he is now entitled. The injunction which the plaintiff seeks will not prevent the defendants from building dams, if they are otherwise entitled to do so, or from ultimately working their mines if it is found that by such means it can be done without injury to the plaintiff. Whether a dam can be constructed to stand the pressure to which it will necessary be subject under these circumstances, and whether it will be of any material use in preventing the flow of the *debris* and the filling of the river below, are questions upon which I am not fully advised. But from the evidence in the case, and my observations of the premises, I am strongly impressed with the belief that sufficient of the *debris* would still pass over the dam in suspension with the water to maintain and even increase the present fill of the river. Besides, it is a very serious question in my mind whether any person or community can or ought to be required to submit to the continuous peril of living under or below such a dam as this must necessarily be, if it is made high enough to impound the coarser material, and this merely for the convenience of another person or persons in the pursuit of his or their private business. It may be likened, at least, to living in the direct pathway of an impending avalanche.

I think the plaintiff is entitled to the relief asked, and concur in the decree ordered.